**In re CAJUN ELECTRIC POWER COOPERATIVE, INC.,**
Debtor.

No. Civ.A., 94–2763–B2.
Bankruptcy No. 94–11474.

United States Bankruptcy Court,
M.D. Louisiana.

Feb. 11, 1999.

See also 230 B.R. 683, 230 B.R. 693.

David S. Rubin, Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, LA, Lon A. Jenkins, Annette W. Jarvis and Mark Dykes, LeBoeuf, Lamb, Greene, & MacRae, LLP, Salt Lake City, Utah, John Parks, LeBoeuf, Lamb, Greene, & MacRae, LLP, Denver, CO, for Ralph R. Mabey, chapter 11 trustee.

Henry J. Kaim, Edward L. Ripley, and Patricia B. Tomasco, Sheinfeld, Maley & Kay, Houston, Texas, Bobby S. Gilliam, Wilkinson, Carmody & Gilliam, Shreveport, LA, for Southwest Louisiana Power Company.

Melanie R. Cohen and Benjamin Schwartz, Altheimer & Gray, Chicago, Illinois, John M. Sharp, Baton Rouge, LA, for the Committee of Certain Members.

R. Patrick Vance and Laura Leigh Blackston, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP, New Orleans, LA, for American Commercial Marine Services.

Edna Ayliffe Latchem, Thibaut, Thibaut, Bacot, Latchem & Vogt, LLP, Baton Rouge, LA, Peter J. Lucas, Doherty, Rumble, & Butler, P.C., Denver, Colorado, for Western Fuels Association.

Edna Ayliffe Latchem, Thibaut, Thibaut, Bacot, Latchem & Vogt, LLP, Baton Rouge, LA, Ronald M. Martin, Holland & Hart, LLP, Colorado Springs, Colorado, for Triton Coal Company.

James R. Lackie and Mark D. Mese, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, LA, for Burlington Northern and Santa Fe Railway.

Gerald Amero, Pierce, Atwood, Scribner, Allen, Portland Maine, Steve Chiccarrelli, Breazeale, Sachse & Wilson, Baton Rouge, LA, for Official Committee of Unsecured Creditors.

Patrick Henry, Sharp, Henry, Cernigliz, Colvin & Weaver, Homer, LA, for Claiborne Electric Power Cooperative.

John W. Hutchison, Voorhies & Labbe, Lafayette, LA, James Davidson and Mark Andrus, Davidson, Meaux, Sonnier, McElligott & Swift, Lafayette, LA, for Southwest Louisiana Membership Corp.

John W. Hutchison, Voorhies & Labbe, Lafayette, LA, Russell Purvis, Smith, Taliaferro, Purvis & Boothe, Jonesville, LA, for Concordia Electric Cooperative, Inc.

James B. Supple, Biggs, Trowbridge, Supple & Cremaldi, Franklin, LA, Berry D. Spears, Winstead, Sechrest & Minick, Austin, TX, for Pointe Coupee Electric Membership Corp.

Tom Phillips and Courtney Smart, Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, for Entergy Gulf States.

Frances M. Toole and Brendan Collins, U.S. Dept. of Justice, Washington, D.C., for Rural Utilities Service.

Matt J. Farley, Preaus, Roddy & Krebs, New Orleans, LA, Michael A. Rosenthal and Janet M. Weiss, Gibson, Dunn & Crutcher, LLP, New York City, for Louisiana Generating, LLC.

Michael R. Fontham, Noel Darce and Karen Freese, Stone, Pigman, Walther, Wittman & Hutchison, New Orleans, LA, for Louisiana Public Service Commission.

## REASONS FOR DECISION

GERALD H. SCHIFF, Bankruptcy Judge.

The court has concluded hearings on confirmation with respect to three separate plans of reorganization in this extremely complex and at times contentious chapter 11 proceeding, namely, (1) the plan in which the chapter 11 trustee and LaGen[1] are co-proponents ("Trustee's Plan"), (2) the plan in which SWEPCO[2] and the Committee of Certain Members[3] are co-proponents ("SWEPCO Plan"), and (3) the plan in which Enron[4]

and the Official Committee of Unsecured Creditors are co-proponents ("Enron Plan"). This latter plan, however, is no longer under consideration, as subsequent to the conclusion of the confirmation hearing Enron withdrew the Enron Plan from the competition.

All interested parties had hoped that this decision, wherein the court was to determine which of three, now two, plans of reorganization would be confirmed, would signal the beginning of the end of what we are told was the longest confirmation hearing ever held in a chapter 11 case. Unfortunately, that is not the case as the court concludes that neither the Trustee's Plan nor the SWEPCO Plan pass muster under section 1129 of the Bankruptcy Code[5].

Everyone involved in this proceeding—the creditors, the Members, the government entities, the Fuel Chain, the plan proponents and the consumers of the State of Louisiana, as well as the court—fervently desires, and are indeed entitled, to experience the beginning of closure of this case. While the plans are not confirmable in their present state, the court does believe, however, that these Reasons for Decision will provide the plan proponents with some guidance in modifying their existing plans so that this proceeding can be concluded without further extended hearings.

## I. THE PRE-PETITION PARTIES

A. *CAJUN, AND ITS MEMBERS.* Cajun Electric Power Cooperative, Inc. ("Cajun") is a non-profit Louisiana electric cooperative corporation that generates and transmits wholesale electric power to its members (individually, "Member", collectively, "Members"). On December 21, 1994 ("Petition Date"), the date this chapter 11 case was filed, Cajun was composed of 12–distribution cooperatives, each being, like Cajun, a non-profit Louisiana electric cooperative[6]. The

1. Louisiana Generating, L.L.C. LaGen is a Louisiana limited liability company, owned 40% by Southern Electric Company ("Southern"), and 30% each by NRG Energy, Inc. ("NRG") and Zeigler Coal Holding Company ("Zeigler").

2. Southwestern Electric Power Company

3. An unofficial committee of 7 members of Cajun Electric Power Cooperative, Inc.

4. Enron & Trade Resources Corp.

5. Title 11, United States Code. References herein to Title 11 are shown as "section ___."

6. Dixie Electric Membership Corporation, Valley Electric Membership Corporation ("Valley"), Northeast Louisiana Power Cooperative, Inc., Beauregard Electric Cooperative, Inc., South

Members in turn supply power to approximately one million individual and commercial customers in rural Louisiana.[7]

**B. *RUS*.** Prior to the Petition Date, Cajun constructed and invested in electric generating and transmission facilities. These facilities were financed primarily through loans from or guaranteed by the United States of America, acting through the Rural Electrification Administration ("REA"), which is the predecessor to the Rural Utilities Service ("RUS"). RUS is Cajun's largest creditor, and is currently owed approximately $4.2 billion by Cajun.[8]

In conjunction with obtaining these loans from the REA and RUS, Cajun executed numerous loan documents by which it agreed to be bound by certain covenants, both affirmative and negative.[9] By virtue of these documents, RUS contends that its claim is secured by a security interest in virtually all of Cajun's assets, including the All Requirements Contracts (the "ARCs"), the revenue from which is the primary source of repayment of such debt.

**C. *THE FUEL CHAIN*.** Cajun's generation assets are primarily coal-fired. Cajun annually purchases between 5 and 6 million tons of coal from Western Fuels Association ("WFA").[10] In order to supply Cajun's needs, WFA obtains coal under a contract with Triton Coal Company ("Triton")[11]. Triton owns the Buckskin Mine which is located in the Northern Powder River Basin in Wyoming, one of the largest coal deposits in the United States.[12] Cajun contracted with the Burlington Northern Railroad ("BN") to move the coal by rail from the Buckskin Mine to St. Louis, Missouri.[13] BN is the only railroad that has track which serves the Buckskin Mine.[14] At St. Louis, the coal is offloaded onto barges owned by American Commercial Marine Services ("ACMS," and, with WFA, Triton, and BN, collectively, the "Fuel Chain"), which then moves the coal down the Mississippi River to the Cajun plant at New Roads.[15]

Prior to its filing for chapter 11 relief, Cajun had entered into long-term or "life of the plant" all-requirements contracts with WFA, BN, and ACMS.[16] Triton, as the supplier of coal to WFA for resale to Cajun, asserts a claim against Cajun under a guaranty executed by Cajun with respect to the WFA/Triton Contract. Based on the evidence presented in the confirmation hearing, the Fuel Chain collectively could have claims in the range of $115 million to approximately $1.673 billion for damages in the event Cajun's contracts with these parties are rejected.[17]

Louisiana Electric Cooperative Association, Washington–St. Tammany Electric Cooperative, Inc. ("WST"), Concordia Electric Cooperative, Inc. ("Concordia"), Jefferson Davis Electric Cooperative, Inc., Claiborne Electric Cooperative, Inc. ("Claiborne"), Pointe Coupee Electric Membership Corporation ("Pointe Coupee"), Southwest Louisiana Electric Membership Corporation, and Teche Electric Cooperative, Inc. ("Teche"). After the Petition Date, Teche was acquired by a for-profit utility, Central Louisiana Electric Company.

7. While Cajun's original mission was to furnish economical and reliable energy to rural customers in Louisiana, Cajun today does have contracts where energy is provided to non-Louisiana users.

8. See RUS Proof of Claim, Docket # 295 filed September 29, 1995.

9. Joint Exhibits Q, R, S, T, U, V, W and X in Adv.Proc. 96–1052. 2/3/98 Tr. at p. 55, ln. 12 through p. 58, ln. 11 (Mr. Mabey).

10. Second Amended Master Disclosure Statement, p. 10, 69.

11. Second Amended Master Disclosure Statement, p. 10, 69.

12. Second Amended Master Disclosure Statement, p. 10, 69.

13. Second Amended Master Disclosure Statement, p. 69.

14. 4/21/97 Tr. At p. 213, lns. 1–8 (D.MacLeod).

15. 4/21/97 Tr. At p. 198, lns. 7–20 (D.MacLeod).

16. *See* Trustee's Exhibit 7 (10/21/97).

17. Mr. Rose, on behalf of SWEPCO, opined that the Rejection Creditors would incur rejection damages aggregating $115 million. *See,* SWEPCO Ex. 1 (5/1/98). Mr. Price, on behalf of the Trustee, testified that, together, BN and ACMS would incur rejection damages aggregating $541 million. 6/16/97 Tr., at p. 73, lns. 14–29 and p. 91, lns. 12–17; Trustee's Exhibit 7 and Exhibit 8 (6/16/97). Mr. Schwartz, Triton's expert witness, testified that the present value of the revenues

### D. *OTHER UNSECURED CREDITORS.*

At the time of the filing in bankruptcy, Cajun had approximately $6 to 7 million in debt owed to other unsecured creditors, including so-called "trade" creditors.[18]

## II. PRE–PETITION HISTORY

### A. *ALL–REQUIREMENTS CONTRACTS.*

Several years prior to the Petition Date, the Members and Cajun entered into long-term wholesale power supply contracts (defined above as the "ARCs") whereby Cajun would supply and the Members would purchase all of the Members' electric power needs. The original ARCs, executed in 1967, between Cajun and all of the Members except SLEMCO [19] were to expire in 2010.[20] When the parties entered into the ARCs, however, Cajun did not own any generation or transmission facilities.[21] The ARCs enabled the Members to obtain financing from RUS for the construction of generation and transmission facilities and to obtain the benefit of pooling loads in order to obtain a more reliable source of power at a better price.[22]

In 1976, all of the Members, including SLEMCO, executed superseding ARCs with Cajun, wherein the terms of the previous ARCs were extended to 2021.[23] One reason the Members entered into the superseding ARCs was to obtain financing from RUS for the construction of additional generation and transmission facilities to serve the growing need of the Members.[24] The generation and transmission facilities thus contemplated were in fact built and are at the present time fully operational.

### B. *THE ALL–REQUIREMENTS CONTRACTS AND REGULATION OF RATES.*

In 1967, when the Members (other than SLEMCO) entered into the ARCs, Cajun's rates to its Members were not regulated by any state agency or commission. In 1976, when the Members (including SLEMCO) entered into the superseding ARCs, the Members did not believe that Cajun's rates were subject to regulation by any state commission.[25] No reference was made in either the 1967 or the 1976 ARCs to any state commission, including the Louisiana Public Service Commission (the "LPSC"). In 1976, the LPSC had not asserted any jurisdiction over Cajun or the rates it charged its Members. Any change in the rates under the 1967 and 1976 ARCs were, however, made specifically subject to the approval of RUS.[26]

### C. *LPSC JURISDICTION OVER CAJUN RATES.*

In 1987, the LPSC first asserted

---

under the Triton contract was $516 million (10/22/97 Tr. at p. 99, ln. 20 through p. 100, ln. 2), and Triton argued that, under Wyoming law, lost revenues was an appropriate measure of damages for breach of contract. *See,* memorandum Brief in Support of Motion to Approve Coal Supply Settlement Agreement (Docket No. 3582), pp. 3–5. Mr. Palmer, on behalf of WFA, testified that, in his opinion, rejection of the WFA contract would cause it to suffer damages of as much as $18 million. 10/23/97 Tr. at p. 23, ln. 16 through p. 24, ln. 20. ACMS filed a proof of claim for anticipated rejection damages of $266,-225,300 (Claim No. 356). BN filed a proof of claim for anticipated rejection damages of $697,-550,000 (Claim No. 357). Triton filed a proof of claim for anticipated rejection damages of $700,-044,405.20 (Claim No. 358). Thus, based on the evidence presented and the proofs of claim filed, the upper limit of the damages incurred by the Rejection Creditors is $1,673,819,700.

18. *See, e.g.,* Trustee's Exhibit 7 (6/7/97); Trustee's Exhibit 11 (10/21/97); 10/21/97 Tr. at p. 110, lns. 6–16 (Mr. Mabey); 4/14/98 Tr. at p. 259, lns. 11–25 (Mr. Mabey).

19. Southwest Louisiana Electric Membership Corporation ("SLEMCO") did not become a member of Cajun until 1976.

20. Joint Exhibits A–1 through A–11 and B–1 through B–11 in Adv.Proc. 96–1052.

21. 1/12/98 Tr. at p. 276, lns. 8–12 (Mr. Poss); Joint Exhibit J in Adv.Proc. 96–1052.

22. 1/12/98 Tr. at p. 276, lns. 8–20 (Mr. Poss); 1/14/98 Tr. at p. 174, lns. 12–16 and p. 178, ln. 24 through p. 179, ln. 9 (Mr. Mabey).

23. Joint Exhibits L–1 through L–12 in Adv.Proc. 96–1052.

24. 1/12/98 Tr. at p. 263, ln. 18 through p. 264, ln. 4 (Mr. J. Williams).

25. 1/13/98 Tr. at p. 55, ln. 20 through p. 57, ln. 19 (Mr. Stringer).

26. 12/16/96 Tr. at p. 75, lns. 2–20 (Mr. Mabey); notes 12 and 15, *supra.*

jurisdiction over Cajun and the rates it charged its Members. Cajun objected to the exercise of jurisdiction by the LPSC and challenged the imposition of this jurisdiction in the courts. In 1989, however, the Louisiana Supreme Court ruled that the LPSC indeed had jurisdiction over Cajun and the rates it charged to its Members.[27] Consequently, immediately prior to and during the pendency of this proceeding, Cajun's rates were regulated by the LPSC, subject to the approval of RUS of any rate change.[28]

**D. THE DRA.** In 1990, Cajun entered into a Debt Restructure Agreement (the "DRA") with RUS. In the DRA, Cajun agreed to be bound by additional affirmative and negative covenants.[29] Pursuant to the DRA, all but three of the Members [30] agreed to extend the term of their respective ARCs to the year 2026. The DRA was submitted to and approved by the LPSC pursuant to LPSC Order No. U–18880.

**E. BIG CAJUN I AND II.** Cajun currently owns Big Cajun I and Big Cajun II, Units 1 and 2. Cajun co-owns Big Cajun II, Unit 3 with Entergy Gulf States, Inc. ("GSU"), with Cajun's interest being 58% of the Unit. In addition, Cajun serves as the operator of Unit 3. The operation of Big Cajun II, Unit 3, is governed by a Joint Ownership and Operating Agreement ("BC–JOPOA"),[31] executed between Cajun and GSU.

**F. CAJUN AS POWER SUPPLIER.** Historically, prior to the time Cajun constructed generating facilities sufficient to supply electricity to all of its Members, Cajun purchased all or most of its power from third parties, including for-profit investor owned utilities ("IOUs"), for resale to its Members in order to fulfill its power supply obligations under the ARCs.[32] Subsequent to constructing its own generating facilities, both prior to the Petition Date and currently, in order to fulfill its power supply obligations under the ARCs,[33] Cajun utilized power generated from Big Cajun I and II, and purchased power from third parties, including IOUs.

**G. USED AND USEFUL ORDER.** In December 1994, the LPSC determined that Cajun's investment in the River Bend nuclear plant was not "used and useful," [34] and, therefore, that Cajun could not recover its investment in River Bend through its rates (the "Used and Useful Order").[35] As a result of this holding, the LPSC ordered Cajun to reduce its rates from the agreed-upon rate in the DRA of 54.5 mills per kWh to 48.8 mills. On December 20, 1994, RUS directed Cajun not to reduce its rates.

**H. BANKRUPTCY FILING.** Although it appealed the Used and Useful Order, on December 21, 1994, Cajun complied with such order and reduced its rates to 48.8 mills. As a result, Cajun was in default

**27.** *Cajun Electric Power Cooperative, Inc., et al. v. Louisiana Public Service Commission,* 544 So.2d 362 (La.1989).

**28.** Trustee's Exhibits XX, YY, ZZ, AAA, BBB, CCC, and DDD in Adv.Proc. 96–1052.

**29.** Joint Exhibit Q in Adv.Proc. 96–1052.

**30.** Claiborne, WST, and Valley did not agree to extend their All–Requirements Contracts in accordance with the DRA. Accordingly, their All–Requirements Contracts expire in the year 2021. Joint Exhibits O–1 through O–9 in Adv.Proc. 96–1052. 1/13/98 Tr. at p. 16, lns. 8–19 (Mr. Springer)

**31.** Trustee's Exhibit 10 in consolidated Adv.Proc. 97–1002 and 97–1068.

**32.** Joint Exhibits E, E–1, F, G–1, G–2, H, I, J and K in Adv.Proc. 96–1052; 1/12/98 Tr. at p. 276, lns. 8–20 and p. 298, lns. 9–15 (Mr. Poss).

**33.** Trustee's Exhibits EEE, FFF, GGG, HHH and Joint Exhibits E, E1, F, G, G–1, G–2, H, I, J, K, and P in Adv.Proc. 96–1052. 12/17/96 Tr. at p. 208 ln. 15 through 210, ln. 2; 1/12/98 Tr. at p. 297, ln. 19 through p. 298, ln. 15 (Mr. Poss); 1/15/98 Tr. at p. 78, ln. 21 through p. 79, ln. 17 (Mr. Mabey); 1/26/98 Tr. at p. 43, lns. 2–4 and p. 46, lns. 15–22 (Mr. MacLeod).

**34.** *Gulf States Utilities Company v. Louisiana Public Service Commission,* 364 So.2d 1266, 1269 (La.1978) ("A general rule of utility regulation is that ratepayer-consumers should only pay the utility company a fair return on facilities and capital actually used and useable for production of service to these ratepayers.") This well-established principle of public utility law is recognized in Louisiana. *See, e.g. Central Louisiana Electric Company v. Louisiana Public Service Commission,* 508 So.2d 1361, 1367 (La.1987).

**35.** 1/12/98 Tr. at p. 106, ln. 20 through p. 107, ln 10 (Mr. J. Williams).

pursuant to the terms of the DRA. Faced with what appeared to be an irreconcilable conflict between the jurisdiction asserted by both RUS and the LPSC, Cajun's Board of Directors voted to seek relief under chapter 11. Cajun's voluntary petition was filed on that same day.[36]

## III. POST–PETITION HISTORY

### A. *APPOINTMENT OF A TRUSTEE.*

On August 23, 1995, the District Court for the Middle District of Louisiana (the "District Court") ordered the appointment of a chapter 11 trustee for Cajun and approved the appointment of Ralph R. Mabey ("Trustee") as that trustee.[37] The Trustee qualified to serve on August 30, 1995.[38] On January 25, 1996, the District Court's decision to appoint a chapter 11 trustee was affirmed by the Fifth Circuit [39].

### B. *TRUSTEE'S DECISION ON REORGANIZING CAJUN.*

Section 1106 of the Bankruptcy Code charges the chapter 11 trustee with specific duties. Section 1106(a)(3) requires the trustee to investigate "acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan ...", while Section 1106(a)(5) requires the trustee to "as soon as practicable, file a plan under section 1121", file a report explaining why the trustee will not file a plan, or recommend conversion or dismissal of the case.

Subsequent to his appointment, and in furtherance of these responsibilities, the Trustee determined that the sale of Cajun's non-nuclear generating assets as opposed to a stand-alone plan would maximize the value of Cajun's estate and provide an optimal solution for reorganizing Cajun.[40]

### C. *RIVER BEND SETTLEMENT.*

One impediment to the sale of the non-nuclear assets of Cajun was Cajun's ownership interest in River Bend, which had been plagued by prolonged and contentious litigation with its co-owner, GSU. In addition, Cajun's participation in River Bend carried with it substantial potential liabilities, including liabilities for decommissioning costs. The Trustee determined the proper course would be to exclude the River Bend assets from the proposed sale, and attempt to divest Cajun's interest in River Bend by settling the River Bend litigation. Ultimately, that litigation was resolved by settlement in an agreement with RUS and GSU. The settlement, which itself resulted in substantial litigation, was consummated on December 23, 1997.[41]

### D. *BID PROCEDURES MOTION AND ORDER.*

On January 22, 1996, after notice and a hearing, at which time all parties in interest were provided with the opportunity to raise any objections they had to the procedure and action proposed by the Trustee, the District Court granted the Trustee's Verified

---

36. *See* Cajun's Voluntary Petition, Docket # 1.

37. *In re Cajun Electric Power Cooperative, Inc.,* 191 B.R. 659 (M.D.La.1995), *aff'd* 74 F.3d 599 (5th Cir.), *cert. denied,* 519 U.S. 808, 117 S.Ct. 51, 136 L.Ed.2d 15 (1996). In ordering the appointment of a trustee the District Court found that Cajun, as debtor-in-possession "is impaired in its ability to reorganize itself because of the actual conflicts it has."

38. 12/16/96 Tr. at p. 57, lns. 9–12 (Mr. Mabey.).

39. *In re Cajun Electric Power Cooperative, Inc.,* 74 F.3d 599 (5th Cir.), *cert denied,* 519 U.S. 808, 117 S.Ct. 51, 136 L.Ed.2d 15 (1996).

40. 12/16/98 Tr. at p. 58 ln. 21 through p. 60, ln. 25 (Mr. Mabey).

41. The settlement agreement among the Trustee, RUS and GSU was approved by the District Court in August of 1996 and affirmed by the United States Court of Appeals for the Fifth Circuit on August 5, 1997. *Matter of Cajun Electric Power Cooperative, Inc.,* 119 F.3d 349 (5th Cir. 1997). The River Bend Settlement resolved all disputes between Cajun and GSU and certain disputes between Cajun and RUS. These disputes were resolved by (i) creating a $125 million (in 1994 dollars) Decommissioning Trust Fund and absolving Cajun of any further liability for decommissioning costs relating to River Bend; (ii) transferring Cajun's interest in River Bend to GSU; (iii) granting to RUS Cajun's share of all litigation cash proceeds associated with litigation against General Electric for alleged River Bend design defects; (iv) resolving the ownership of transmission assets and resolving the transmission disputes between Cajun and GSU; and (v) resolving all other outstanding claims between Cajun and GSU and between RUS and GSU, and certain claims between Cajun and RUS.

Motion to Establish Procedures for Submission of Proposals to Purchase Assets (the "Bid Procedures Motion").[42] The Bid Procedures Motion provided that the proposal selected by the Trustee as the highest and best offer for Cajun's non-nuclear assets would be incorporated in the Trustee's plan of reorganization, which pursuant to an order of the District Court, was to be filed by April 22, 1996.

**E. LEAD PROPOSAL.** The Trustee, with the assistance of his court-approved financial consultants, Wasserstein Perella & Co., developed a strategy for the solicitation of bids for Cajun's non-nuclear assets. This strategy included preparing an information memorandum and disseminating the memorandum to parties that might be interested in acquiring Cajun's non-nuclear assets. After receiving twelve proposals, including a joint proposal from NRG and Zeigler, and separate proposals from SWEPCO, Enron, and Southern, the Trustee issued a second request for certain proposals to be made in cash. After evaluating the responses to the second request for proposals, the Trustee selected the joint proposal of NRG and Zeigler, which established a purchase price of $1,069,300,000 with a proposed rate of approximately 44 mills per kWh.

**F. THE TRUSTEE'S PLAN.** The Trustee filed a plan of reorganization, as ordered by the District Court, on April 22, 1996. Although Southern initially filed its own plan, that plan was shortly withdrawn as on September 30, 1996, Southern joined forces with NRG and Zeigler as a joint participant in LaGen, the entity formed to purchase the non-nuclear assets of Cajun under the Trustee's Plan.

**G. THE ENRON PLAN.** The Official Unsecured Creditors' Committee of Cajun Electric Power Cooperative, Inc. (the "UCC") and Enron jointly filed a plan of

reorganization. However, as stated above, on September 24, 1998, Enron filed its Notice of Withdrawal of Plan, and that plan is no longer under consideration by the court.

**H. THE SWEPCO PLAN.** The Committee of Certain Members (the "CCM") and Southwestern Electric Power Company ("SWEPCO") jointly filed a plan of reorganization. That plan was in fact filed a day or so prior to the Trustee's Plan.

**I. DISCLOSURE STATEMENTS.** On November 12, 1996, the court approved a Second Amended Master Disclosure Statement [43] agreed to by all the plan proponents.[44] Each plan proponent also filed, and received approval of, a Supplemental Disclosure Statement that described the specifics of its respective plan and also contained a discussion by the plan proponents as to why its plan should be accepted by creditors and confirmed by the court.

**J. FINAL PLAN BAR DATE ORDER.** On March 6, 1998, in order to conclude the confirmation hearing and to require final proposals with respect to the purchase price and rates offered under each plan, the Bankruptcy Court entered the Order Setting Bar Date for Filing Final Plan Amendments, which fixed March 18, 1998, as the final bar date for filing amendments to the three competing plans. In compliance therewith, each plan proponent filed their final plan amendments on March 18, 1998.

The Trustee's Plan incorporated a final purchase price of $1.188 billion, while the SWEPCO Plan provided for a final purchase price of $933.5 million, with an additional $7 million available for the payment of "trade" claims.[45]

## IV. LAW AND ANALYSIS

### A. ADVERSARY 96–1052.

Many of the objections to confirmation of the Trustee's Plan deal with the treatment of

---

42. The Trustee's initial proposal under the Bid Procedures Motion was to have bids be based on a set rate. In response to objections by the Members and the LPSC to any set rate, the Trustee agreed, and the order provided, that the bidders would be allowed to make proposals for both the price to be paid for Cajun's assets and the proposed rates to charge to Cajun's customers, including the Members. 12/16/96 Tr. at p. 103, Ins. 9–13 (Mr. Mabey).

43. Docket No. 2187.

44. Docket No. 2185.

45. Both of the plans have a different interest adjustment mechanism. Therefore, changes in interest rates will affect the relative purchase prices of each plan.

the ARC's and the Members. Many of those same issues were raised by the parties in a separate adversary proceeding entitled *In re Cajun Electric Members Committee, et al.* Adversary Proceeding Number 96–1052 ("Adv. 96–1052"). The court previously announced its proposed ruling on cross motions for summary judgment on several of the counts contained in Adv. 96–1052. The trial on the remaining counts was consolidated with the hearings on confirmation. The court has now entered Reasons for Decision in Adv. 96–1052, 230 B.R. 693, which reasons are incorporated herein by reference.

## B. *CONFIRMATION STANDARDS.*

 In order for a plan to be confirmed, the plan proponent bears the burden of proof with respect to each and every element of section 1129(a).[46] Even where no objection is lodged, the court still must examine each of the listed confirmation standards:

> Regardless of whether a valid objection to confirmation has been asserted, however, the Code imposes upon the Court the responsibility to determine whether the requirements of § 1129(a) of the Code have been met. (Citations omitted.) Discharging this responsibility does not entail investigation of the debtor. But it does require the court to require sufficient documentation to be submitted and to ask appropriate questions concerning the requirements of § 1129(a). (Citation omitted.) As that section states on its face, absent satisfaction of each of the requirements of § 1129(a), confirmation may not be ordered.

*In re The Prudential Energy Company,* 58 B.R. 857, 862 (Bkrtcy.S.D.N.Y.1986).

The following parties have filed objections to the Trustee's Plan: LPSC, Claiborne, Enron, and SWEPCO/CCM.

Objections to the SWEPCO Plan have been filed by the following parties: SLEM-CO, Pointe Coupee and Concordia (collectively, "S/PC/C"), the Trustee, Enron, the LPSC, GSU, WFA/Triton, BN, ACMS, and the UCC.

As many of the objections raised to the various plans are overlapping in nature, the court will discuss the confirmability of each plan with regard to the requirements of section 1129(a):

### 1. *Sections 1129(a)(1) and (a)(2)*

The first two requirements of section 1129(a) are that the plan [section 1129(a)(1)] and the plan proponent [section 1129(a)(2)] comply with all applicable provisions of Bankruptcy Code.

### (a) *THE TRUSTEE'S PLAN*

SWEPCO argues that the Trustee's Plan fails to comply with section 1129(a)(1) in that the Trustee's Plan violates provisions of both sections 1122 and 1123(a)(6).

(1) *Section 1122.* SWEPCO argues that the Trustee's Plan fails to satisfy the requirements of section 1122 in that it places substantially dissimilar equity interests in the same class. Section 1122 provides that:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such case.

> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

SWEPCO contends that the Trustee's Plan improperly places both the Members' patron-

---

**46.** *See, e.g., In re Guilford Telecasters, Inc.,* 128 B.R. 622, 625 (Bkrtcy.M.D.N.C.1991) ("The burden of establishing these requirements lies with the proponents of the plan. *In re Trail's End Lodge, Inc.,* 54 B.R. 898 (Bankr.D.Vt.1985); and *In re Prudential Energy Co.,* 58 B.R. 857 (Bankr. S.D.N.Y.1986).") The court notes that in *Matter of Aegis Specialty Marketing Inc. of Alabama,* 68 F.3d 919, 922 (5th Cir.1995), and although the appeal was dismissed for lack of jurisdiction, the court stated "... we do not address the issue of whether the district court was correct when it held that the burden of proving the confirmability of a plan of reorganization is upon the proponent of the plan."

age capital accounts[47] and the Members' membership equity interests in a single class (Class 5). SWEPCO argues that patronage capital interests are substantially dissimilar from the membership equity interests for the following reasons: (1) patronage capital has a liquidation preference over the membership interest under Cajun's Bylaws; (2) patronage capital varies in amount with each holder, while the membership interests are identical; and (3) membership interests are voting and patronage capital interests are non-voting under Cajun's Bylaws.

The Trustee responds that all of the equity rights associated with membership in Cajun are properly classified in a single class. The Trustee argues that each Member holds an accumulation of rights that make up its equity interest and these rights may not be split into separate classes.

■ The court agrees with the Trustee's analysis. The patronage capital accounts and the membership interests are not separate equity interests but merely represent different features of the same equity interest. The court concludes that the classification of the Members' patronage capital accounts and membership interests in a single class does not violate section 1122.

(2) *Section 1123(a)(6).* SWEPCO argues that the Trustee's Plan fails to comply with section 1123(a)(6) which requires that Cajun's charter include a provision prohibiting issuance of non-voting securities. Section 1123(a)(6) provides that:

> (a) Notwithstanding any otherwise applicable non-bankruptcy law, a plan shall—
>
> * * *
>
> (6) provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph (5)(B) or (5)(C) of this subsection, of a provision prohibiting the issuance of non-voting equity securities, ...

The Trustee's Plan provides:

11.2 *Charter Amendment.*

> To the extent Section 1123(a)(6) of the Bankruptcy Code is deemed to apply in this case, the provision required by such subsection shall be deemed to be included in the Articles of Incorporation and Bylaws of Reorganized Cajun.

Section 1123(a)(6) essentially requires that the charter of a reorganized debtor corporation must include a provision prohibiting the issuance of nonvoting equity securities. Article 11.2 of the Trustee's Plan effectively would amend Cajun's Bylaws and Articles of Incorporation to include a provision complying with section 1123(a)(6), that is, prohibiting nonvoting equity securities.

■ The patronage capital accounts held by the Members are equity securities, albeit in differing amounts for each Member. To comply with section 1123(a)(6), such interests must enjoy voting rights. However, if the patronage capital interests are given voting rights based upon the amount of each individual account, the Members would no longer be on a "one member, one vote" basis, as required by the Louisiana Cooperative Law. LSA–R.S. 12:408(G). The "one-member, one-vote" rule is a fundamental tenet of cooperative law and the failure to comply with this rule would preclude Reorganized Cajun from being treated as a cooperative for federal income tax purposes.[48]

■ The dilemma inherent in the Trustee's Plan is an attempt to maintain Cajun' s cooperative structure, but, in doing so, the plan conflicts with the provisions of section 1123(a)(6). While there may be a means to structure the Members' equity interests to comply with section 1123(a)(6) while at the same time maintaining the cooperative structure post-confirmation, the Trustee's Plan, in its present state, fails to accomplish this result.

**(b) THE SWEPCO PLAN**

Numerous objections have been raised contending that the SWEPCO Plan fails to

---

47. The court has previously held that the Members' patronage capital accounts are an equity interest rather than a claim on a debt, and are therefore subordinate to unsecured claims.

48. 3/19/98 Tr. At p. 40 (J.H. Smith).

comply with section 1129(a)(1) in that the provisions of sections 1122, 1123(a)(4), 1123(a)(5), 1127, 365 and 541 are violated.

■ (1) *Sections 1127/1125.* Section 1125 requires that a plan proponent obtain approval of a disclosure statement prior to seeking acceptance of a plan. While all plan proponents complied with section 1125 originally in this case, certain modifications were filed to all plans subsequent to disclosure statement approval.

■ Generally speaking, section 1127(c) requires that a plan proponent shall comply with the disclosure requirements of section 1125 with respect to any modified plan. The jurisprudence, however, has recognized that in certain cases, *i.e.*, those dealing with modifications which are deemed "immaterial", confirmation may occur without need for further disclosure. In discussing the requirement of additional disclosure under section 1127(c), one court observed:

> Section 1127(c) requires that all modifications satisfy the adequacy-of-disclosure concerns of Section 1125. 11 U.S.C. § 1127(c). This does not necessarily mandate the preparation of a new disclosure statement and resolicitation of the plan, however. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 411, U.S.Code Cong. & Admin.News 1978, p. 6367 (1977) ("if the modification were sufficiently minor, the court might determine that additional disclosure was not required"); 5 Collier on Bankruptcy, ¶ 1127.03, p. 1127–26 (15th ed.1987) ("a new disclosure statement is not required in every case where a modification is requested"). *Further disclosure occurs only when and to the extent that the debtor intends to solicit votes from previously dissenting creditors or when the modification materially and adversely impacts parties who previously voted for the plan.* (Emphasis added.)

*In re American Solar King Corp.,* 90 B.R. 808, 823 (Bkrtcy.W.D.Tex.1988).

The contention is made that the SWEPCO Plan, as modified, cannot be confirmed as section 1127(c)'s requirement of compliance with section 1125 did not occur in several material aspects.

• *Treatment of the ARCs of S/PC/C.* The Trustee and S/PC/C argue that the SWEP-CO Plan as amended fails to comply with section 1125 as the treatment accorded therein of the ARCs of S/PC/C is a materially adverse change from the treatment set forth in SWEPCO's Supplemental Disclosure Statement, and no subsequent disclosures have been approved by the court or made by SWEPCO. The SWEPCO Supplemental Disclosure Statement states the following in Section 4(a) at page 14:

> Pursuant to Section 3.6(a) of the Asset Purchase Agreement, on the effective date, SWEPCO and the Members shall execute new all requirements contracts to replace and supersede the Supply Contracts with the Debtor. This effectively moots the legal challenges to the Supply Contracts and preserves the market for the benefit of creditors.

And at page 27:

> The key element that distinguishes the SWEPCO Plan is the support of the member cooperatives. Under the terms of the three other plans, the plan proponents are seeking to impose or cramdown their plans on the members without their consent. This cramdown comes in the form of the continued existence of Cajun as a paper G & T. Cajun is kept alive under these plans solely to prop up and assume the benefits of the all requirements contracts by which these plan proponents seek to service the members. Without the power market represented by the members, it is undisputed that the assets of Cajun have materially less value than is being offered by any of the plan proponents. In an effort to capture the members as customers, the other plan proponents have resorted to a scheme whereby Cajun is kept alive to ostensibly assume the contracts....

S/PC/C argue that their treatment under the present version of the SWEPCO Plan is materially different from that which was originally set forth in the SWEPCO Supplemental Disclosure Statement. While the initial disclosures indicated that the plan would be consensual, Article VII, Section 7.1 of the SWEPCO Plan now provides:

On the Effective Date, SWEPCO and the Members who have consensually agreed to do so shall execute new power supply agreements to replace and supersede the Supply Contracts with the Debtor substantially in the form attached hereto as Exhibit 2. Any power supply agreements between the Debtor and those members who have not agreed to enter into new power supply agreements as set forth above, shall be neither assumed nor rejected, but shall remain in effect and subject to any collateral assignments to RUS, to the extent of applicable state and federal law.

While the treatment proposed in the SWEPCO Plan does in fact differ from that proposed in the disclosure statement, the difference in treatment results from the decision by S/PC/C to support the Trustee's Plan rather than the SWEPCO Plan. Not only did S/PC/C once support the SWEPCO Plan, they were in fact co-proponents of the SWEPCO Plan. These parties who now complain of the lack of disclosure are substantial players in this proceeding, and not just ordinary creditors who are entitled to rely upon the information disseminated in an approved disclosure statement. The court finds it disingenuous at best for these cooperatives to argue that they did not receive adequate information regarding their treatment. The court believes that S/PC/C were fully informed of their treatment at the time of the filing of the amendments to the SWEPCO Plan.

█ The court has substantial discretion in determining whether a disclosure statement provides "adequate information" as required by section 1125. *See, e.g., Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir.1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court. (Citations omitted.))"

█ Under the circumstances of the case, the court finds that the failure of the proponents of the SWEPCO Plan to provide additional disclosure with respect to the change in treatment of the ARCs of S/PC/C does not violate sections 1125/1127(c). While the

treatment of S/PC/C's ARCs under the SWEPCO Plan may pose some problems, as will be discussed at a later point in these reasons, lack of disclosure is not one of those problems.

● *SWEPCO/RUS Settlement.* During the course of the confirmation hearings, SWEPCO and RUS reached an agreement ("SWEPCO/RUS Settlement") regarding various issues. Although SWEPCO initially sought approval of the SWEPCO/RUS Settlement by separate motion, the court ultimately determined that all settlements should be part of the respective plans. Such decision was based in part upon the fact that such settlements were contingent upon confirmation of the plan with which each was associated. The SWEPCO Plan was amended to include the SWEPCO/RUS Settlement.

The Trustee argues that the incorporation of the SWEPCO/RUS Settlement into the SWEPCO Plan, without additional disclosures, creates problems which preclude confirmation of the SWEPCO Plan.

Under SWEPCO's original plan, the estate's right to avoid the RUS liens was retained, and SWEPCO asserted that such right constituted a significant portion of potential payment to Cajun's unsecured creditors, particularly the rejection creditors. SWEPCO's settlement with the RUS, however, removes the right to pursue estate causes of action against RUS for avoidance of liens and caps the recovery for unsecured creditors.

The SWEPCO Supplemental Disclosure Statement advised parties in interest that causes of action against RUS would be pursued. The Trustee suggests that certain creditors may have reasonably believed that the estate's avoiding causes of action against the RUS would result in significantly higher returns to them on account of their rejection claims. The settlement with RUS was not contemplated in the SWEPCO Supplemental Disclosure Statement and accordingly was not disclosed therein. The Trustee argues, therefore, that the SWEPCO Supplemental Disclosure Statement is inadequate in its description of treatment of RUS liens and possible settlement, and that the modifications

to the SWEPCO Plan caused by the inclusion of the SWEPCO/RUS settlement violates section 1127(c) because the SWEPCO Plan as modified does not comply with section 1125.

■ The court acknowledges that the treatment of the RUS in the SWEPCO Plan differs dramatically from the treatment described in the SWEPCO Supplemental Disclosure Statement. The difference in treatment is a result of the SWEPCO/RUS Settlement. SWEPCO and the CCM filed a motion for approval of the settlement agreement with the RUS on October 24, 1997. The certificate of service attached to that motion indicates that all of the major parties in this case received a copy of the motion and attached settlement agreement. The settlement agreement set forth in the October 24, 1997, motion is virtually identical to the SWEPCO/RUS Settlement incorporated in the SWEPCO Plan. In fact, the only major difference is that there are now additional funds being paid to unsecured creditors by virtue of the settlement. While the court acknowledges that the trade creditors holding possible rejection claims would be concerned with the difference in treatment, those creditors received notice of SWEPCO's attempt to seek approval of the settlement with the RUS in October 1997, and the subsequent inclusion of that settlement in the SWEPCO Plan.

As stated above, the court has substantial discretion in determining whether a disclosure statement provides "adequate information" as required by section 1125. Under the circumstances of this case, the court finds that the failure of the proponents of the SWEPCO Plan to provide additional disclosure with respect to the change in treatment of the RUS does not run afoul of sections 1125/1127(c). While including the SWEPCO/RUS Settlement in the SWEPCO Plan may pose some problems, as will be discussed at a later point, lack of disclosure is not one of those problems.

(2) *Section 1123(a)(4)*. Section 1123(a)(4) provides that a plan must:

provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

● *Trade Creditors.* The SWEPCO Plan provides for the following treatment of Classes 6(a) and 6(b):

**Class 6(a) and 6(b). Allowed Unsecured Claims and Allowed Convenience Claims.** In full and complete satisfaction of all Allowed Convenience Claims and Allowed Unsecured Claims, holders of such Claims will be paid a Pro Rata share of the Class 6 Fund . . .

The Class 6 Fund consists of $20,240,000 plus all net proceeds from the avoidance actions. Class 6(a) consists of allowed convenience claims, which are allowed claims originally scheduled by Cajun in the amount of $20,000 or less. Class 6(b) consists of all allowed unsecured claims, including the Members' claims, deficiency claims and rejection claims.

The original plan filed by SWEPCO provided for SWEPCO to purchase certain designated unsecured trade claims by paying up to $7 million following confirmation. SWEPCO would then receive any distributions on account of those claims.[49] Class 6(a) and Class 6(b) were to share ratably in certain funds returned to Cajun's estate under the avoidance actions. SWEPCO would receive distributions in these classes in the shoes of creditors whose claims it acquired.

Now, under the proposed SWEPCO/RUS settlement, which is incorporated into the SWEPCO Plan, SWEPCO will purchase certain designated trade claims for their full value and increase the purchase price under the Plan by up to $7 million. The extra $7 million of the purchase price will then be paid to RUS on account of its secured claims. Then, RUS uses these funds to purchase from SWEPCO the trade claims earlier acquired by SWEPCO for the same price SWEPCO paid for them. At this point, the trade claims are apparently satisfied and extinguished without further distribution from the estate.

49. SWEPCO Disclosure Statement at 2.

The Trustee argues that this circuitous treatment results in a 100% payment to trade creditors, but a substantially lower payment to other Class 6(a) and Class 6(b) creditors under the SWEPCO Plan, and that this result violates section 1123(a)(4)'s prohibition against disparate treatment of creditors in the same class. Illustrative of the cases where section 1123(a)(4) was involved is *In re Union Meeting Partners,* 165 B.R. 553 (Bkrtcy.E.D.Pa.1994). There the plan proposed an extra 15% dividend to unsecured creditors who voted for the plan and agreed to release certain non-debtors from any liability. Sustaining the objection of a large undersecured creditor (who interestingly had filed a competing plan), the court observed that "[t]he clear dictates of § 1123(a)(4) require us to deny confirmation of the Debtor's Plan for that reason." *Id.* at 567.

■ The Fifth Circuit discussed section 1123(a)(4)'s applicability to certain payments made by SWEPCO to the Members in *Matter of Cajun Electric Power Cooperative, Incorporated,* 150 F.3d 503 (5th Cir.1998). The court held that the payments "did not constitute discrimination amongst claims of the same class as contemplated by this section [1123(a)(4)] because the payments were not derived, directly or on this record indirectly, from assets of the bankruptcy estate." *Id.* at 518. In the instant case, the money being paid to the favored trade creditors indeed comes indirectly from assets of the estate. Although SWEPCO is advancing the $7 million for the purchase of the claims, it will not do so until and unless the SWEPCO/RUS Settlement is approved and the SWEPCO Plan is confirmed. Then, and in that event, the purchase price for the non-nuclear assets is increased by an equal amount. Those funds are ear-marked for payment to the RUS who in turns uses them to purchase the trade claims from SWEPCO. The court concludes that this circuitous use of an increase in the purchase price is nothing other than a method of attempting to disguise discrimination against those unsecured creditors whose claims are not being so purchased, in particular, the rejection damage claims held by the Fuel Chain.

Accordingly, as the SWEPCO Plan fails to comply with the provisions of section 1123(a)(4), it cannot be confirmed since section 1129(a)(1) is not satisfied.

■ ● *Consenting vs. Non–Consenting Members' ARCs.* The Trustee and S/PC/C also argue that the SWEPCO Plan fails to provide the same treatment with regard to the ARCs of S/PC/C as opposed to the ARCs of those Members who support the SWEPCO Plan. Article VII, Section 7.1 of the SWEPCO Plan includes the following provision regarding the ARCs:

On the Effective Date, SWECO and the Members who have consensually agreed to do so, shall execute new power supply agreements to replace and supersede the Supply Contracts with the Debtor substantially in the form attached hereto as Exhibit 2. Any power supply agreements between the Debtor and those Members who have not agreed to enter into new power supply agreements as set forth above, shall be neither assumed or rejected, but shall remain in effect and subject to any collateral assignments to the RUS, to the extent of applicable state and federal law.

The Trustee and S/PC/C contend that this provision results in different treatment between the consenting and non-consenting cooperatives. Although the court agrees that the cooperatives will be treated differently, that treatment is based upon their choice rather than by virtue of the SWEPCO Plan being confirmed. Each cooperative has been offered the option of entering into new power supply contracts. The same contract was offered to all parties. S/PC/C chose not to enter into the contract. Thus, the difference in treatment between S/PC/C results solely as a result of their choice. Accordingly, the court finds that the SWEPCO Plan does not violate section 1123(a)(4) on account of this provision allowing Members to select which contract they wish.

(3) *Section 1123(a)(5).* Section 1123(a)(5) requires that a plan shall "provide adequate means for the plan's implementation." The Trustee argues that the SWEPCO Plan fails to provide for adequate means for the plan's implementation in that the plan provides only

$150,000.00 to pay fees and expenses for litigation of all causes of action. At the present time, the Trustee has filed in excess of one hundred preference actions. The SWEPCO Plan provides that the Trustee is authorized to pursue all causes of action of the estate and does not provide for the payment of fees or expenses in excess of $150,000.00. The Trustee alleges that this sum is inadequate. The Trustee further alleges that the failure to provide adequate funding for such litigation is significant since creditors in Class 6(a) and Class 6(b) will receive the proceeds of the recovery from those causes of action. If the Trustee has insufficient funds to prosecute the avoidance causes of action, the unsecured creditors will receive less distribution on their claims.

No evidence was presented at the confirmation hearing by either party with respect to this issue. While the plan proponent certainly has the burden of proof on all confirmation standards, the court has no reason to believe that $150,000.00 would not be sufficient. Further, in view of the total consideration being provided by the SWEPCO Plan, the court would be not inclined to deny confirmation on this sole ground, believing that some form of immaterial modification could be structured to cure this defect which the court considers *de minimis* in the overall scheme of things. However, since there are other grounds for denial of confirmation of the SWEPCO Plan, the court would suggest to the plan proponents of the SWEPCO Plan that this issue be properly addressed in any future plan amendments.

(4) *Section 1123(b).* Section 1123(b)(2) provides that a plan may—

subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section.

Section 365 allows a trustee to assume or reject any executory contract or unexpired lease of the debtor. The court has held in Adv. 96–1052, 230 B.R. 693, that the ARCs are assumable executory contracts under section 365.

The Trustee and S/PC/C argue that the treatment of S/PC/C's ARCs in the SWEPCO Plan renders that plan nonconfirmable.

Article VII, Section 7.1 of the SWEPCO Plan provides that:

On the Effective Date, SWECO and the Members who have consensually agreed to do so, shall execute new power supply agreements to replace and supersede the Supply Contracts with the Debtor substantially in the form attached hereto as Exhibit 2. Any power supply agreements between the Debtor and those Members who have not agreed to enter into new power supply agreements as set forth above, shall be neither assumed or rejected, but shall remain in effect and subject to any collateral assignments to the RUS, to the extent of applicable state and federal law.

The Trustee and S/PC/C contend that the SWEPCO Plan creates an impossible circumstance where S/PC/C's ARCs are neither assumed nor rejected, as Reorganized Cajun will not have the ability to perform its obligations thereunder. SWEPCO takes the position that section 1123(b)(2) is permissive and does not compel the plan to assume, assign, or reject the ARCs.

█ The failure of the SWEPCO Plan to either assume, assign or reject the ARCs of S/PC/C is significant. What is the effect on such contracts which are not dealt with in a plan? The jurisprudence generally supports the proposition that executory contracts which are neither assumed nor rejected during the chapter 11 proceeding flow through the proceeding without alteration:

A lease or executory contract that is neither rejected nor assumed passes through the bankruptcy to the reorganized debtor. *See Smith v. Hill,* 317 F.2d 539, 542 n. 6 (9th Cir.1963) (" 'failure to assume affirmatively an executory contract does not result at any time in rejection of the contract. . . . [T]he contract can be rejected only by affirmative action. . . . Unless so rejected, the contract continues in effect' ") (*quoting* 8 Collier on Bankruptcy, at 162 (14th ed.)). [Citations omitted.]

*In re Polysat, Inc.,* 152 B.R. 886, 890 (Bkrtcy.E.D.Pa.1993). *See, also, In re Cole,* 189 B.R. 40, 46 (Bkrtcy.S.D.N.Y.1995) ("Section 1123(b)(2) is permissive. The plan may

provide for the assumption or assignment of an executory contract. On the other hand, the contract may 'ride through' the plan as unaffected.")

While the court does not disagree with the foregoing pronouncements, the fact pattern of the instant case suggests that under what is basically a liquidating plan, a fair reading of sections 365 and 1123(b)(2) requires a finding that the plan must address executory contracts. If the court were to confirm the SWEPCO Plan, can it be said that the ARCs of S/PC/C will "ride through" the proceeding unaffected? Of course not, as they will be affected on the first day following the effective date of such plan as they will be without a source of electricity. This amounts to a *de facto* rejection of the such contracts.

Under the circumstances of this case, the court concludes that, in failing to deal with the ARCs of S/PC/C, the SWEPCO Plan does not comply with sections 365 and 1123(b).

(5) *Section 1122.* Proper classification of claims and interests is dealt with in section 1122:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such case.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

 The Trustee and ACMS argue that the SWEPCO Plan improperly classifies the Members' Capital Credit claims, *i.e.,* claims for patronage capital accounts, in Class 6(b) along with other unsecured claims. The court disagrees.

Article 3.6.2 of the SWEPCO Plan provides that:

Class 6(b). Allowed Unsecured Claims. Class 6(b) consists of all Allowed Unsecured Claims, not otherwise classified, including but not limited to Members'

claims,[fn] deficiency claims and claims arising from the rejection of executory contracts. Class 6(b) is impaired.

---

[fn]The Trustee or other parties may contend that a portion or all of the Members' Allowed Unsecured Claims are subordinated to other Allowed Unsecured Claims. If the subordination is established by Final Order, some or all of the Members' Allowed Unsecured Claims will be treated as subordinate to Allowed Unsecured Claims not otherwise subject to subordination.

The court has previously held that the Members' patronage capital accounts are subordinate to unsecured claims as a type of equity.[50] Additionally, the footnote to Article 3.6.2 cited above indicates that the proponents of the SWEPCO Plan recognized that to the extent the court determines the Members' claims should be subordinated, they are so subordinated under the SWEPCO Plan. The court reiterates its prior holding that the Members' claims based upon the patronage capital accounts are not Allowed Unsecured Claims under the definition provided in the SWEPCO Plan, but are equity claims. Such claims, therefore, are not included in Class 6(b). The objections to the SWEPCO Plan raised by the Trustee and ACMS regarding noncompliance with section 1122 are without merit.

(6) *Sections 541 and 365.* Numerous parties have objected to the SWEPCO Plan on the basis that the plan proposes to (1) transfer assets free and clear of liens, claims and interest, which assets are not property of the estate under section 541, but rather constitute property of a joint venture existing between the Debtor and GSU, and (2) rejects contracts which are not contracts of the Debtor, but rather are contracts of the joint venture. The court has previously addressed these issues, both of which deal with the interpretation and effect of the BC–JOPOA between Cajun and GSU.

The first issue presented is whether the BC–JOPOA create a joint venture as to Big Cajun II, Unit 3. During the course of this chapter 11 proceeding, GSU sought a determination of its potential liability to the Fuel

50. See discussion at p. 729.

Chain in connection with the BC–JOPOA[51]. On September 3, 1997, in oral reasons given with respect to pending cross-motions for summary judgment, the court stated:

> The Trustee seeks summary judgment [that] there was no joint venture between Gulf States and Cajun relating to Big Cajun II Unit 3. While neither Western Fuels nor Triton has specifically moved for summary judgment to the contrary, jurisprudence under Rule 56 suggests the Court may render summary judgment in their favor on that issue if the evidence so dictates. Based upon the jurisprudence we discussed earlier, the Court concludes that a joint venture relationship did, in fact, exist between Gulf States and Cajun with respect to Big Cajun II Unit 3. The evidence supports the conclusion that each and every element required for the establishment of a joint venture is present. While it may be argued that Gulf States has no present control over Unit 3, it has, in fact, contractually given their right of control to Cajun by virtue of the joint operating agreement, which is certainly the equivalent of a partner signing a partnership agreement naming another partner as the managing partner. Neither is the lack of sharing of profits crucial. The profits of this joint venture is the production of electrons for the availability of the joint venture[r]s. Money profit was not contemplated by the parties.[52]

While the court subsequently withdrew its order granting summary judgment in Adversary Proceedings 97–1002, the court's conclusion with respect to a joint venture existing as to Big Cajun II, Unit 3, remains viable on the instant issue.

■ Certain assets have been acquired by the joint venture, including Unit 3 itself. The SWEPCO Plan does in fact purport to transfer such assets to SWECO, notwithstanding the fact that the joint venture is not a debtor in any proceeding. While Cajun's interest in the joint venture may well be the subject of such transfer, assets owned by the joint venture are beyond the reach of this proceeding.

The latter issue, relating to the Debtors contracts with the Fuel Chain, is presently before the court in Adversary Proceedings 97–1002 and 97–1068.[53] In those proceedings, the court concluded that the BC–JOPOA executed by Cajun and GSU did not create a joint venture as to the entire Big Cajun II operation. Accordingly, the contracts between Cajun and the Fuel Chain with respect to Big Cajun II are contracts of Cajun alone and not of any joint venture between Cajun and GSU. Such contracts, therefore, may be subject to rejection under section 365 in this proceeding.

Inasmuch as the SWEPCO Plan attempts to improperly transfer certain assets of the joint venture to SWECO, which assets are not property of the estate in this proceeding, the SWEPCO Plan violates sections 541 and 365, and, again, the requirement of section 1129(a)(1) is not satisfied.

### 2. *Section 1129(a)(3)*

Section 1129(a)(3) requires a finding that the plan must have been proposed in good faith and not by any means forbidden by law.

### (a) *THE TRUSTEE'S PLAN*

Both Claiborne and SWEPCO argue that the Trustee's Plan was not proposed in good faith and was proposed by means forbidden by law. The objections are based essentially on Reorganized Cajun' structure as proposed by the Trustee's Plan.

SWEPCO and Claiborne argue that the Trustee's Plan (1) involuntarily binds the Members as captive customers for 25 years; (2) prohibits the Members from exercising the authority granted to them in Cajun's Bylaws; (3) creates a structure which has no economic justification; and (4) was proposed to financially benefit LaGen. The opponents argue that such provisions contained in the Trustee's Plan are contrary to the fundamen-

---

**51.** Adversary Proceedings 97–1002 and 97–1068.

**52.** 9/3/98 Tr. at pp. 15–16.

**53.** The court has this day entered separate reasons for decision and orders with regard to those adversaries and those reasons and orders are incorporated herein by reference.

tal purpose and spirit of the bankruptcy law to force the continued existence of a reorganized debtor that (1) is not wanted by its owners; (2) is a non-profit entity which is not intended to and will not be furthering its basic purpose; and (3) will be controlled contrary to the laws governing its organization.

 The Fifth Circuit discussed the "good faith" requirement as a confirmation standard:

Section 1129(a)(3) requires that a debtor's plan be proposed in good faith and not by any means forbidden by law. The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start. *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir.1985). "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of 1129(a)(3) is satisfied." *Id.* A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design and indeed may not be confirmable. *In re Briscoe Enter., Ltd., II,* 994 F.2d 1160, 1167 (5th Cir.1993).

*Financial Security Assurance, Inc. v. T–H New Orleans Limited Partnership (In re T–H New Orleans Limited Partnership),* 116 F.3d 790, 802.

SWEPCO and Claiborne also argue that the Trustee's Plan is proposed by means forbidden by law in that it violates the Louisiana Cooperative Law and Louisiana law relating to obligations. The court has already addressed the arguments regarding the treatment of the Members' ARC's in the Trustee's Plan in its Reasons for Decision entered with regard to Adv. 96–1052, which reasons are adopted herein by reference.

 In Adv. 96–1052, 230 B.R. 693, the court concluded that the Trustee's Plan calls for an improper modification of the ARC's in that it seeks to bind the Members for 25 years to treatment which they do not want

and for which they did not contract. The court believes that the Trustee's attempt to retain the cooperative structure as presently proposed has no economic justification and results in the Members being bound as captive customers for 25 years without the authority and control which they previously held. Such result is contrary to established cooperative law, and, in addition results in a failure of "cause" pursuant to relevant Louisiana law.

The court concludes that the primary purpose of retaining a Reorganized Cajun under the Trustee's Plan was not "the legitimate and honest purpose to reorganize" the debtor and providing the debtor with a "reasonable opportunity for a fresh start," but the preservation of the benefit of the ARCs for LaGen.

For the foregoing reasons, as amplified by the written reasons in Adv. 96–1052, 230 B.R. 693, the court finds that the Trustee's Plan violates the provisions of section 1129(a)(3) and is not confirmable.

**(b) *THE SWEPCO PLAN***

Numerous parties have objected to the SWEPCO Plan on the basis that the plan was not proposed in good faith for various reasons, including (1) SWEPCO's purchase of the trade claims; (2) the alleged discrimination in treatment between the consenting and non-consenting cooperatives; (3) the untimely notice of the identity of officers and directors; and (4) SWEPCO's failure to negotiate with members of the fuel chain.

(1) *Purchase of Trade Claims.* The court has previously addressed SWEPCO's purchase of trade claims, and has determined that SWEPCO's purchase of those claims does not represent a lack of good faith. Accordingly, the objections raising that issue are without merit.

(2) *Discrimination between Consenting and Non–Consenting Members.* The court has held earlier in this decision that the SWEPCO Plan treatment of the ARCs of S/PC/C is not discriminatory and results from the decision of S/PC/C not to enter into new supply contracts with SWECO. On the same basis as discussed earlier, the court finds that the fact that the ARCs of S/PC/C

are treated differently under the SWEPCO Plan does not constitute a lack of good faith.

(3) *Untimely and Inadequate Notice of Identity of Officers and Directors.* S/PC/C argue that SWEPCO's Notice of Officers and Directors was both inadequate and untimely. While section 1129(a)(5) requires a plan proponent to disclose certain information regarding the individuals who will serve as officers and directors of the reorganized debtor or successor of the debtor, S/PC/C argue that SWEPCO's untimely and inadequate notice is not only a violation of section 1129(a)(5), but also represents a lack of good faith. S/PC/C allege that SWEPCO intentionally waited until the close of SWEPCO's confirmation case to file the notice so that no party would be able to cross-examine SWEPCO representatives with respect to the notice. S/PC/C points to the fact that the notice was filed on May 1, 1998, and served upon the parties by first class mail rather than being distributed to parties who were all present in court on the date of filing.

In view of the fact that the court is not confirming the SWEPCO Plan on other more substantive grounds, the court need not delve deeply into this particular objection. SWEPCO did provide notice, although the timeliness of such notice is certainly suspect. Upon any hearings held in connection with amendments which SWEPCO may file, this particular objection to confirmation may well be moot. Nonetheless, the court is not able to conclude that SWEPCO's failure to timely notify parties in interest constitutes a lack of good faith under section 1129(a)(3).

The court will discuss S/PC/C's arguments regarding the inadequacies of the notice under section 1129(a)(5) at a later point.

### 3. *Section 1129(a)(4)*

Section 1129(a)(4) requires that any payments made or to be made under the plan for services or for costs and expenses has been approved or is subject to approval by the court as reasonable.

### (a) *THE TRUSTEE'S PLAN*

No party in interest has filed any objection to the Trustee's Plan regarding this provision. The Trustee's Plan provides that:

11.10 *Fees and Costs.*

In accordance with Section 1129(a)(4) of the Bankruptcy Code, any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the case, or in connection with the Plan and incident to the case, shall be approved by the Court or shall be subject to the Court as reasonable. Without limiting the foregoing, if and to the extent required to comply with Section 1129(a)(4) of the Bankruptcy Code, Generating shall submit the fees of its professionals for approval by the Court.

The court concludes that the Trustee's Plan complies with the requirements of section 1129(a)(4).

### (b) *THE SWEPCO PLAN*

The Fifth Circuit has already ruled upon the issue of whether certain payments made by SWEPCO to certain of the Members violate section 1129(a)(4) as well as other provisions of the Bankruptcy Code:

The plain language of 1129(a)(4), however, likewise leads us to reject the district court's construction of 1129(a)(4) as requiring in all circumstances that the bankruptcy court review a payment subject to 1129(a)(4) for reasonableness prior to the making of the payment. The language of the statute merely states that, as a condition precedent to plan confirmation, any payment "made or to be made by the proponent ... for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case" must "ha[ve] been approved by, or [be] subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). Nothing in this language purports to require that the bankruptcy court review a pre-confirmation payment prior to its being made.

*Matter of Cajun Electric Power Cooperative, Inc.,* 150 F.3d 503, 514 (5th Cir.1998). The Court went on to state that:

the bankruptcy court correctly concluded that the SWEPCO Plan cannot be ap-

proved unless and until it reviews SWEP-CO's payments to the CCM and concludes that they were reasonable. Assuming that this review takes place and the bankruptcy court concludes that the payments were reasonable (and such determination is not clearly erroneous), 1129(a)(4) poses no barrier to the confirmation of the SWEPCO Plan.

150 F.3d at 515. Further, in footnote 4 of the opinion, the Court stated:

In the event that the bankruptcy court determines that the payments were, in whole or in part, unreasonable, it will doubtless order the disgorgement of the unreasonable portion of the payments. Assuming that the CCM were to comply with such an order—we were advised at oral argument that the CCM has expressly agreed to do so—1129(a)(4) would in all probability pose no barrier to confirmation of the SWEPCO Plan.

*Ibid.*

In addressing Fees and Expenses, Article 8.9 of the SWEPCO Plan provides that:

Pursuant to Code Section 1129(a)(4), fees for services, costs and expenses incurred in connection with Cajun's bankruptcy case or in connection with the Plan and incident to Cajun's bankruptcy case, including, but not limited to the reasonable fees, costs and expenses of secured creditors, parties to unexpired leases or executory contracts to be assumed, and indenture trustees shall be subject to approval of the Court.

In light of the Fifth Circuit's prior ruling, the court finds that this provision of the SWEPCO Plan satisfies the requirements of section 1129(a)(4). Although the court has not yet reviewed nor ruled upon the reasonableness of the fees, to the extent that the court finds the fees, or any portion thereof, to be unreasonable, the CCM has agreed to disgorgement. The court concludes that section 1129(a)(4) poses no barrier to confirmation of the SWEPCO Plan.

### 4. *Section 1129(a)(5)*

Section 1129(a)(5) requires, in general, that (1) a plan proponent disclose (a) the identity and affiliations of individuals proposed to serve as officers and directors of the debtor following confirmation, and (b) the identity and proposed compensation of any insider that will be employed or retained by the reorganized debtor; and (2) the appointment or continuance of such individual in such office is consistent with the interests of creditors and equity security holders and with public policy.

### (a) *THE TRUSTEE'S PLAN*

Both Claiborne and SWEPCO contend the Trustee's Plan fails to comply with these requirements.

Subparagraph (f) of paragraph 7.4 *Continuation and Operation of Reorganized Cajun,* of the Trustee's Plan provides:

(f) *Governance of Reorganized Cajun.*

The individuals serving as officers and directors of Cajun on the Effective Date will continue in such offices of Reorganized Cajun after the Effective Date until replaced in accordance with the Articles of Incorporation and Bylaws governing Reorganized Cajun. Prior to the Confirmation Date, the Trustee shall designate in a written statement to be filed with the Court the names and affiliations of individuals intended to serve as directors and senior officers of Reorganized Cajun to the extent such individuals differ from those identified in the previous sentence or to the extent those individuals are unwilling to serve post-Effective Date. The contracts that the Trustee has entered into with senior officers of Cajun do not extend beyond the Effective Date. Thus, Reorganized Cajun shall be able to enter into new employment contracts with its officers after the Effective Date.

In addition, on June 16, 1998, the Trustee filed a Supplemental Disclosure Respecting Officers and Directors setting forth the current officers and directors willing to serve, and their proposed compensation.

SWEPCO and Claiborne argue that the Trustee's Plan not only has failed to disclose the identities of the proposed officers and directors, but also improperly grants the Trustee the authority to appoint officers and directors. The opponents argue that this improper grant of authority is in violation of

section 1129(a)(5)(i) in that the appointment is inconsistent with the interests of creditors, equity security holders and public policy.

■ The court disagrees. With the June 18, 1998, filing, the Trustee disclosed the names of officers and directors who were willing to serve. Although this filing was arguably late as it was filed on the same date as the post-hearing confirmation briefs, the court also believes that Article 7.4(f) of the Trustee's Plan satisfied section 1129(a)(5)(i). The Trustee's Plan provides that the same officers and directors who had served prior to the appointment of the Trustee would continue to serve. All parties in interest were fully aware of the identity of these individuals. Accordingly, the court finds that section 1129(a)(5)(i) is satisfied.

Further, the court does not believe that the Trustee's Plan violates section 1129(a)(5)(ii). The officers and directors indicated by the Trustee are the same officers and directors approved by Cajun's board prior to the appointment of the Trustee. Finally, no evidence was presented at confirmation to suggest that the continuation of some or all of the current officers and directors would not be consistent with the interest of creditors and equity security holders and with public policy.

Accordingly, the court finds that the proponents of the Trustee's Plan have satisfied the disclosure requirements of section 1129(a)(5).

### (b) THE SWEPCO PLAN

As stated above (in discussing their objection based on lack of good faith under section 1129(a)(3)), S/PC/C here argue that SWEPCO's Notice of Officers and Directors was not only untimely, but also insufficient to satisfy the requirements of section 1129(a)(5).

S/PC/C argue that SWEPCO has failed to present any proof that the appointment of these officers are consistent with the interests of creditors, equity security holders and public policy. They further allege that two of the three individuals proposed were involved in the "BREMCO takeover" and have signed a secret and undisclosed deal with Valley.[54] No evidence was offered, however, by S/PC/C or any other party to indicate that the appointment of these individuals would not be consistent with the interests of creditors, equity security holders and public policy.

Finally, S/PC/C argue that SWEPCO has failed to identify and disclose the nature and amount of compensation to be paid to Messrs. Shockley, Madison, and Smith, each of whom are officers of SWEPCO's parent company, Central and South West Corporation, and each of whom is a SWEPCO insider. The court need not struggle at this time with determining whether these individuals are insiders within the meaning of section 101(31). As stated earlier in these reasons, considering that the SWEPCO Plan is not being confirmed, this particular objection to confirmation may well be mooted by plan amendments which SWEPCO may file, which amendments the court suggests should include appropriate disclosure of compensation to be paid to these individuals, if any.

### 5. Section 1129(a)(6)

Section 1129(a)(6) requires that any governmental regulatory commission with jurisdiction over the rates of the debtor after confirmation has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

### (a) THE TRUSTEE'S PLAN

■ While the Trustee's Plan provides that they will seek all necessary regulatory approval,[55] the Trustee and LaGen refuse to be bound by any decisions of the LPSC. Based upon this position, several parties argue that the Trustee's Plan violates the re-

---

54. Although an original member of Cajun, Bossier Electric Membership Cooperative, Inc. ("BREMCO"), was acquired by SWEPCO in 1993, and is no longer involved with Cajun. During the course of the Cajun proceeding, the court was informed of the proposed acquisition of Valley by SWEPCO in 1995. None of these facts, however, were presented in connection with the confirmation hearings.

55. Trustee's Plan, Paragraph 9.2(a) and (d); Third Amended and Restated Asset Purchase and Reorganization Agreement, at pp. 16 and 44.

quirements of section 1129(a)(6). The court disagrees.

Although the Trustee's position regarding the requirement may affect the feasibility of the Trustee's Plan, which will be discussed at a later point in these reasons, the Trustee's Plan clearly meets the requirements of section 1129(a)(6) in that it provides it will seek all necessary regulatory approval.

### (b) *THE SWEPCO PLAN*

Section 1129(a)(6) requires that any regulatory commission with jurisdiction over the debtor's rates has approved any rate change or any rate change is subject to such approval. The SWEPCO Plan provides that it is subject to all necessary regulatory approvals and SWEPCO has agreed to seek all necessary regulatory approvals. No party in interest has raised any objection with regard to this provision and the court finds that the SWEPCO Plan meets the requirement of section 1129(a)(6).

### 6. *Sections 1129(a)(7)*

■ Known as the "best interest test", section 1129(a)(7) requires that, with respect to impaired classes, each holder of a claim has either accepted the plan, or will receive or retain property of a value not less than the amount that such holder would have received if the debtor were liquidated under chapter 7. This requirement is designed to protect those individual creditors who voted against a particular plan, but who, nonetheless, are being bound to such plan. If such minority creditor would receive at least as much value under the plan as it would receive through liquidation under chapter 7, the court must paternalistically find that the plan is in their best interests.

### (a) *THE TRUSTEE'S PLAN*

No party in interest objected to the Trustee's Plan on this ground. The court finds that the Trustee's Plan satisfies the requirements of section 1129(a)(7).

**56.** Section 1126(c) provides:

### (b) *THE SWEPCO PLAN*

S/PC/C argue that the SWEPCO Plan violates section 1129(a)(7)(ii) in that they would receive more in a chapter 7 liquidation than they will receive under the SWEPCO Plan. S/PC/C contend that in a chapter 7 liquidation, the payment to trade creditors called for under the SWEPCO Plan would be available for distribution. The court disagrees.

Under the SWEPCO Plan, the funds used to purchase the claims of trade creditors comes from the SWEPCO/RUS Settlement, *i.e.*, SWEPCO increased its purchase price by an additional $7 million in order to fund such purchase. In a chapter 7 liquidation, however, there would be no SWEPCO/RUS Settlement and thus these additional funds would not be available for distribution. Accordingly, the court finds that the argument of S/PC/C is without merit.

■ The Trustee contends that the SWEPCO Plan violates the best interest of creditors test based upon the treatment of the ARCs of the non-consenting Members, namely S/PC/C. Under the SWEPCO Plan, the ARCs of the Members who do not negotiate new contracts are neither assumed, assigned or rejected. The Trustee argues that this treatment not only fails to bring value to the estate, which would be obtained in a chapter 7 liquidation, but in fact creates liability on the part of the estate as the Trustee will be unable to perform the contracts. The Trustee thus concludes that more value would be obtained in a chapter 7 liquidation.

The court agrees with the Trustee's analysis. The experts suggest that the value of Cajun's non-nuclear physical assets is in the neighborhood of $400 million. SWEPCO and LaGen, however, are each willing to fork up approximately $1 billion if their plan is confirmed. The difference is made up in the value of the ARCs. By excluding any value attributable to the ARCs of those Members who do not sign up with SWEPCO, the SWEPCO Plan fails to satisfy the best interest test of section 1129(a)(7)(ii).

### 7. *Sections 1129(a)(8)*

Section 1129(a)(8) provides that each class must either accept[56] the plan by the requi-

(c) A class of claims has accepted a plan if

site vote or not be impaired.[57]

### (a) *THE TRUSTEE'S PLAN*

The Trustee's Plan establishes the following classes:

Class 1—Priority Claims

Class 2(a)(1)—RUS Secured Claim

Class 2(a)(2)—Hibernia Secured Claim

Class 2(a)(3)—CoBank Secured Claim

Class 2(a)(4)—Other Secured Claims

Class 3—Unsecured Claims

Class 4—Subordinated Member Claims [58]

Class 5—Member Interests

Class 1 is not impaired and pursuant to the provisions of section 1126(f) is deemed to have accepted the Trustee's Plan. Sufficient ballots in favor of the Trustee's Plan were received by Classes 2(a)(1), 2(a)(2) and 2(a)(3). No claims were asserted in Class 2(a)(4) and, consequently, no ballots were filed in that class.

While more than two-thirds in dollar amount of Class 3 claims actually voting cast ballots in favor of the Trustee's Plan, a majority in number voted against the Trustee's Plan. At first blush, therefore, the Trustee's Plan did not receive sufficient votes to satisfy the requirements of section 1129(a)(8).

The Trustee, however, filed a Motion to Designate Votes Pursuant to 11 U.S.C. Section 1126(e), pursuant to which the Trustee seeks to have the court designate approximately $7 million in unsecured trade claims as being deemed in support of the Trustee's Plan. Section 1126(e) provides:

> (e) On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

The Trustee seeks such designation based upon the argument that both Enron and SWEPCO agreed to purchase these claims outside of their respective plans in the event that their plan is confirmed. Further, the Trustee complains that the UCC sent sample ballots to the trade creditors and that this ploy resulted in Class 3's vote in favor of the Enron Plan and the SWEPCO Plan and against the Trustee's Plan. If these trade claims are designated as requested by the Trustee, Class 3 will have accepted the Trustee's Plan both in number and dollar amount.

■ Initially the court points out that acquiring claims is an acceptable practice in chapter 11 proceedings. In fact, Rule 3001(e), Federal Rules of Bankruptcy Procedure, sets forth the requisite procedure for parties to follow where claims are transferred.

■ A substantial body of case law has developed under section 1126(e). A fair reading of this jurisprudence suggests that, in order for the court to designate votes, the party requesting such relief must introduce evidence of some act, scheme, plan, or device on the part of the acquiring creditor sufficient to sustain a finding of bad faith. Several cases have held that a creditor is not in bad faith when that creditor attempts to purchase all unsecured claims on similar terms. This situation occurred in a case before this court, *In re Cinque, Inc. of New Jersey*, Case No. 96–51316, where a secured creditor offered to purchase all unsecured claims for 100% of value. The court refused to designate such votes. *See also, e.g., In re DeLuca*, 194 B.R. 797 (Bkrtcy.E.D.Va.1996). Furthermore, relief under section 1126(e) is the exception and not the rule, and a creditor is free to vote its own self-interest with respect to its claim. *In re Dune Deck Owners Corp.*, 175 B.R. 839 (Bkrtcy.S.D.N.Y.1995).

---

**57.** Section 1124.

**58.** The court has previously held that all claims of the Members for capital credit are equity. As a result, there are no claims in Class 4.

such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

In the present case, based upon negotiations with the UCC, Enron initially agreed to purchase trade creditor votes if its plan was confirmed. SWEPCO subsequently agreed to provide the same treatment if the SWEPCO Plan was confirmed. By letter dated November 18, 1996, counsel for the UCC urged unsecured creditors to vote in favor of the Enron Plan and the SWEPCO Plan, but to express a preference for neither, and to reject the Trustee's Plan. The letter explained that both the Enron Plan and the SWEPCO Plan would provide for full payment of trade claims, while the Trustee's Plan provided no assurance of full payment. Included with the letter was a sample ballot instructing the creditors how to vote as recommended by the UCC.

The Trustee argues that the conduct of the UCC constitutes a bad faith solicitation so as to justify designation of votes under Section 1126(e). The court disagrees. The action of the UCC in making a recommendation to its constituents does not represent a lack of good faith, particularly since the UCC was recommending that the creditors vote in favor of both the SWEPCO and Enron Plans. The fact that the UCC was recommending favorable votes for the SWEPCO Plan while they were a co-proponent of the Enron Plan indicates that the UCC was merely fulfilling its obligation to advise its members of the treatment under each plan and make recommendations accordingly.

The Trustee has made no allegation that the UCC's letter contained any factual inaccuracy or omission. In addition, the inclusion of a sample ballot merely indicated to the creditors how the ballot should be marked if they chose to accept the recommendation of the UCC. Both the letter and the sample ballot clearly indicated that it was only a sample and should not be used for voting purposes and that the creditors should carefully review the plans and the disclosure statements regarding treatment under each plan. The court finds that there has been no showing of a lack of good faith based upon either the letter sent by counsel for the UCC or the inclusion of a sample ballot with that letter.

For the foregoing reasons, the court determines that designation under section 1126(e) is not appropriate in this case. Accordingly, the Trustee's Plan is not confirmable under section 1129(a).

The Trustee argues, however, that even if Class 3 is deemed to have rejected the Trustee's Plan, the requirements of section 1129(b) are satisfied. Section 1129(b), commonly known as the "cramdown" provision of chapter 11, provides that the court may confirm a plan over the rejection of an impaired class, but only if all requirements of section 1129(a) have been satisfied other than subparagraph 8. For confirmation to occur, section 1129(b)(1) requires that the plan must be "fair and equitable" with respect to and not "discriminate unfairly" against the non-accepting class.

A plan proponent, however, may seek confirmation under section 1129(b) only if all provisions of section 1129(a) are satisfied other than subparagraph 8. In this case, the court has determined that the Trustee's Plan is not confirmable under other provisions of section 1129(a). Therefore, the ability to confirm the Trustee's Plan under the cramdown provisions of section 1129(b) is not permissible.

Accordingly, the Trustee's Plan is not confirmable as the requisite votes of Class 3 have not been obtained.

**(b)** *THE SWEPCO PLAN*

For two reasons, ACMS argues that the court should find that SWEPCO has not received sufficient favorable votes in Class 6 to satisfy the requirements of section 1129(a)(8).

(1) Initially, RUS voted to reject the SWEPCO Plan. As discussed earlier herein, agreement on the SWEPCO/RUS Settlement was achieved during the confirmation process. Part and parcel of the RUS/SWEPCO Settlement required RUS to seek authority from the court to change its ballot on the SWEPCO Plan from "Rejects" to "Accepts". RUS has filed such a motion, which is pending before the court.

If the court does not allow RUS to change its vote, the SWEPCO Plan does not have sufficient votes in Class 6 as RUS's unsecured claim is in excess of $3 billion. ACMS contends that RUS's motion to change its vote in favor of the SWEPCO Plan should be denied.

Rule 3018(a) permits a creditor to change its vote when "cause" exists:

(a) ... For cause shown, the court after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection....

This court previously addressed this identical issue in considering the motion of S/PC/C to change their votes from rejecting to accepting the Trustee's Plan. The court noted at that time that the Fifth Circuit jurisprudence "suggests that subsequent negotiations between the plan proponent and the party seeking to change its ballot suffices as the required cause." [59] Based upon that jurisprudence [60], the Court granted the S/PC/C request to change their votes so as to support the Trustee's Plan.

The same reasoning should apply to RUS's motion to change its vote with respect to the SWEPCO Plan. The subsequent negotiations between RUS and SWEPCO suffices as cause so as to allow RUS to change its vote in favor of the SWEPCO Plan. As observed by the court in the *American Solar King* case, "[t]he goal after all is consensual plans." 90 B.R. at 825. Such being the goal, what greater evidence of cause exists than where major parties in a chapter 11 proceeding negotiate a settlement of highly complex litigation, thus helping to pave the way to a consensual plan? Further, there has been no showing that the reason for the vote change was tainted or improperly motivated. Accordingly, RUS's Motion to Change Vote [61] is **GRANTED.**

(2) ACMS next argues that the trade creditor votes accepting the SWEPCO Plan should be designated as negative votes. The court has previously addressed the designation of votes issue in connection with the Trustee's Plan. Although the proponents of the Trustee's Plan sought to designate negative votes as positive, and ACMS here seeks to designate positive votes as negative, the same principles apply. For the reasons given hereinabove, the court denies ACMS's request to designate the trade creditor votes pursuant to section 1126(e).

Accordingly, the objections raised to the SWEPCO Plan under section 1129(a)(8) are without merit. The court finds that a sufficient number of ballots, in both number and dollar amount, have accepted the SWEPCO Plan.

### 8. *Section 1129(a)(9)*

Section 1129(a)(9) addresses the treatment of certain priority claims. No party in interest has objected to either the Trustee's Plan or the SWEPCO Plan on the basis of this section. The court has reviewed both plans and finds that each plan satisfies the requirements of section 1129(a)(9).

### 9. *Section 1129(a)(10)*

Section 1129(a)(10) requires that at least one impaired class has accepted the plan if any impaired classes exist. Both the Trustee's Plan [62] and the SWEPCO Plan [63] satisfy this requirement.

### 10. *Section 1129(a)(11)*

Section 1129(a)(11) requires a finding by the court that confirmation of the plan is not likely to be followed by the liquidation or need for further financial reorganization. This is commonly referred to as the "feasibility test."

---

**59.** 9/3/97 Tr. at p. 40.

**60.** The cases which the court relied upon are *Matter of Texas Extrusion Corp.*, 844 F.2d 1142 (5th Cir.1988), and *In re American Solar King*, 90 B.R. 808 (Bkrtcy.W.D.Tex.1988).

**61.** Docket Number 3982.

**62.** Classes 2(a)(1), 2(a)(2), and 2(a)(3) are impaired classes which have voted to accept the Trustee's Plan.

**63.** Classes 3, 4, 5, 6, and 7 are impaired classes which have voted to accept the SWEPCO Plan.

■■■■ A key element of feasibility is whether there exists the reasonable probability that the provisions of the plan can be performed.[64] The purpose of the feasibility test is to protect against entirely speculative plans. However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required.

■■■■ On the issue of feasibility in general, the Fifth Circuit stated recently in the case of *Matter of T–H New Orleans Limited Partnership*, 116 F.3d 790, 801 (5th Cir. 1997):

> Section 1129(a)(11) codifies the feasibility requirement and requires that confirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the plan. 11 U.S.C. § 1129(a)(11). To allow confirmation, the bankruptcy court must make a specific finding that the plan as proposed is feasible. *In re M & S Assoc., Ltd.*, 138 B.R. 845, 848 (Bankr.W.D.Tex. 1992). The standard of proof required by the debtor to prove a Chapter 11 plan's feasibility is by a preponderance of the evidence, *Briscoe*, 994 F.2d at 1165, ....
>
> In determining whether a debtor's Chapter 11 plan of reorganization is feasible, we noted in *Briscoe* that "the [bankruptcy] court need not require a guarantee of success ..., [o]nly a reasonable assurance of commercial viability is required." *Id.* at 1165–66; *see also Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2nd Cir. 1988). All the bankruptcy court must find

is that the plan offer "a reasonable probability of success." *In re Landing Assoc., Ltd.*, 157 B.R. 791, 820 (Bankr.W.D.Tex. 1993).

With these principles in mind, the court will address the feasibility objections to both the Trustee's Plan and the SWEPCO Plan.

### (a) *THE TRUSTEE'S PLAN*

Claiborne, the LPSC, Enron and SWEPCO/CCM have objected to the Trustee's Plan, raising two issues regarding feasibility, namely, the Trustee's Plan is not likely to receive the necessary regulatory approval, and the Trustee's Plan is not financially feasible.

(1) *Regulatory Approval.* The Trustee's Plan is expressly conditioned on obtaining the approval for any rate change provided for in the Trustee's Plan from any governmental regulatory commission with jurisdiction over such rates, including express approval by the Federal Energy Regulatory Commission ("FERC")[65]. If the Trustee's Plan is confirmed and becomes effective, the FERC will regulate the wholesale rates charged by LaGen to Reorganized Cajun, and, in turn, by Reorganized Cajun to its members. This is a natural consequence of the discharge of Cajun's debt to RUS. The same result will obtain if the SWEPCO Plan is confirmed, that is, FERC will regulate the wholesale rates charged by SWEPCO to the Members. In addition, the Trustee's Plan[66] provides that LaGen will, on or before the effective date, seek qualification from FERC as an exempt wholesale generator ("EWG") under the Public Utility Holding Company Act of 1935 ("PUHCA"), as amended by the Energy Policy Act of 1992[67].

---

**64.** *Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir.1985) ("the feasibility test contemplates 'the probability of actual performance of the provisions of the plan.... The test is whether the things which are to be done after confirmation can be done as a practical matter....'") (*citing Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman)*, 585 F.2d 1171, 1179 (2d Cir.1978)); *see also Jorgensen v. Federal Land Bank of Spokane (In re Jorgensen)*, 66 B.R. 104, 108 (9th Cir. BAP 1986); *In re Greene*, 57 B.R. 272, 277–78 (Bkrtcy.S.D.N.Y.1986); *In re Jartran, Inc.*, 44

B.R. 331, 393 (Bkrtcy.N.D.Ill.1984) ("The touchstone of feasibility is whether or nor the Debtor emerges from reorganization with reasonable prospects of financial stability and success, and in particular the ability to meet the requirements for capital expenses.").

**65.** Trustee's Plan, ¶ 9.2(d).

**66.** Trustee's Plan, ¶ 7.2.

**67.** 15 U.S.C. § 79z.

While the court has concluded that the Trustee's Plan satisfies the provisions of section 1129(a)(6) relating to seeking governmental regulatory approval, the objectors contend that the Trustee's Plan is not feasible because such regulatory approval is not likely to occur.

Following years of widespread fraud and mismanagement by gas and electric utility holding companies, Congress enacted PUHCA in 1935 in order to protect the interests of both investors and ratepayers.[68] In the latter part of the 80's, the traditional monopoly structure of the power industry began to break down in favor of competition.[69] Congress amended PUHCA in 1992 to ease some of the restrictions on acquisitions and securities financings by covered companies.[70] One such amendment "exempted EWGs 'from all provisions of [the Act.]' 15 U.S.C. § 79z–5a(e)." [71]

An EWG is defined as—

any person ... exclusively in the business of owning or operating ... all or part of one or more eligible facilities and selling electric energy at wholesale.[72]

The phrase "eligible facility" is also a defined term under PUHCA, and means a facility that is either—

used for the generation of electric energy exclusively for sale at wholesale, or ... used for the generation of electric energy and leased to one or more public utility companies.... [73]

One of the conditions of obtaining EWG status requires compliance with 15 U.S.C. § 79z–5a:

If a rate or charge for ... electric energy produced by a facility ... was in effect under the laws of any State as of October 24, 1992, in order for the facility to be considered an eligible facility, every State commission having jurisdiction over any such rate must make a specific determina-

tion that allowing such facility to be an eligible facility (1) will benefit consumers, (2) is in the public interest, and (3) does not violate State law....

The Trustee and LaGen have agreed to request such findings from the LPSC, but refuse to agree to be bound by the LPSC findings. Resolution of the issue of feasibility does not require the court to determine the effect of the proponents' refusal to be bound by the LPSC determination. The issue the court must focus upon is whether or not LPSC is more likely than not to decide favorably on the request.

The Trustee argues, however, that any finding by the LPSC is unnecessary both as a matter of statutory construction and as a matter of prevailing federal bankruptcy law. The Trustee has in fact requested that the court refrain from ruling on whether any findings by the LPSC are necessary. The court disagrees with the Trustee. LaGen acquiring EWG status from the FERC is undeniably a strong condition precedent to consummation of the Trustee's Plan. To acquire such status, an "eligible facility" must be involved. Under the relevant provisions of PUHCA, such determination is to be made by the LPSC, who "must make a specific determination that allowing such facility to be an eligible facility (1) will benefit consumers, (2) is in the public interest, and (3) does not violate State law."

Nothing could be more clear than this Congressional pronouncement. Before an entity may take advantage of acquiring EWG status, and thus be exempt from certain regulatory control under PUHCA, Congress determined that the state commission possessing rate-making authority over the facility involved should be called upon to hold a "public interest" hearing. This prerequisite does not in any way conflict with the dictates of the Bankruptcy Code. The court concludes, therefore, that favorable LPSC action

---

**68.** *National Association of Regulatory Utility Commissioners v. Securities & Exchange Commission,* 63 F.3d 1123, 1124 (D.C.Cir.1995).

**69.** *Campaign for a Prosperous Georgia v. Securities and Exchange Commission,* 149 F.3d 1282, 1284 (11th Cir.1998).

**70.** *Ibid.*

**71.** 63 F.3d at 1125.

**72.** 15 U.S.C. § 79z–5a(a)(1).

**73.** 15 U.S.C. § 79z–5a(a)(2).

is an essential element for a determination of LaGen's request for EWG status.

The Trustee alternatively argued that, in the event the court determined that an LPSC finding was of public interest is necessary, such will be obtained. This is where the court must determine feasibility.

The testimony regarding the "rate paths" of the competing plans was voluminous, extremely technical, and, to some extent speculative. The delivered price of coal, which includes transportation costs, is the primary ingredient in determining rates. All experts agreed that the further out an estimate is made, the greater the risk of miscalculation—the science of rate-projecting is just not that precise.

■ Based on the testimony presented, the court finds that, on a levelized basis, the rates offered by the Trustee's Plan are virtually identical to the rates under the SWEPCO Plan for the first 15 years following confirmation. Although the LPSC has vigorously opposed the Trustee's Plan throughout the entire confirmation process, by order dated November 17, 1997, the LPSC found that the rate path under the Trustee's Plan (as well as each of the competing plans) was "not presumptively unreasonable." The LPSC's expert witness, Mr. Steven J. Baron, thereafter testified that the LaGen rate path (as those of the competing plans) was "reasonable." [74]

Based upon the rate testimony presented by the parties, the court concludes that a reasonable likelihood exists for the LPSC to find that the proposed transfer is in the public interest. Further, the regulatory risk inherent in the Trustee's Plan is not at an unacceptable level, and is not any greater that the SWEPCO Plan. Remembering the Fifth Circuit admonishment in *Briscoe*, ("the [bankruptcy] court need not require a guarantee of success ..., [o]nly a reasonable assurance of commercial viability is re-

quired." 994 F.2d at 1165–66), the court concludes that insofar as regulatory approval is concerned, the Trustee's Plan satisfies the feasibility requirement of section 1129(a)(11).

(2) *Financial Feasibility.* The objectors also argue that the Trustee's Plan is not financially feasible. The objectors argue that the 3.2% rate of return projected by the Trustee's expert, Dr. Michael Yokell, leaves the plan with no margin for error. Additionally, the objectors argue that Dr. Yokell's analysis does not take into account a loss of load when the ARC's with Claiborne, WST, and Valley expire in year 21 of the 25 year term. The Trustee responds that Dr. Yokell's testimony was conservative, while the objectors argue that Dr. Yokell's projections are overly optimistic based upon faulty assumptions, including the assumption that the Members would increase their respective loads over the next 25 years and that the market costs for wholesale electricity will increase in the next 25 years.

■ The court finds that the Trustee has satisfied his burden of proving that the plan is financially feasible. While Dr. Yokell testified that LaGen would realize only a rate of return of 3.2% on their equity investment, he emphasized that the financial projections that he made to assess the feasibility of the Trustee's Plan were "conservative." [75] Dr. Yokell's projections show that at each point going forward cash flows are positive.[76] Even based on his conservative financial projections, Dr. Yokell testified that LaGen is "likely to be viable." [77] Dr. Yokell further testified that, in his opinion, "the chance of Southern defaulting on a credit like this is minuscule." [78] Where, as demonstrated by Dr. Yokell's projections, there are positive cash flows going forward at each point, there would be a strong incentive to make any necessary cash infusions to support the already "sunk costs." The CCM, Claiborne,

---

74. 4/14/98 Tr. at p. 15, ln. 10 through p. 118, ln 18 (S. Baron).

75. *Id.* at lns. 10–15.

76. 4/8/98 Tr. at p. 81, ln. 16 through p. 84, ln. 23 (Dr. Yokell).

77. *Id.* at lns. 16–23.

78. 4/8/98 Tr. at p. 77, ln. 25 through p. 79, ln. 3; p. 275, ln. 23 through p. 276, ln. 18.

and Enron did not present any credible evidence to rebut Dr. Yokell's testimony.

Claiborne also argues that Dr. Yokell's testimony is based upon the faulty assumption that the market costs for wholesale electricity will increase in the next 25 years. Dr. Yokell did not merely assume that the wholesale market rate for electricity would increase, but rather, through a voluminous, complex and detailed financial model projected the wholesale market rate over the next 25 years.[79]

The CCM also argues that Reorganized Cajun will not have sufficient funds to pay its future costs and should be expected to need future reorganization. However, under the Trustee's Plan, Reorganized Cajun is required to charge its members a rate sufficient to meet all of its costs of operation. Thus, whatever Reorganized Cajun's costs are, they will be covered by revenues received under the ARCs.

Claiborne also contends that because it, WST, and Valley have ARCs that expire in 21 years, LaGen will fail at that time because of the loss of load. However, this argument ignores the fact that if these three members do not elect to extend their ARCs for four more years, LaGen will sell the power that it would have sold to them to someone else. Since that power will be sold at the wholesale market rate and Dr. Yokell's projections for years 22 through 25 show that wholesale market rate will be approximately 15 mills per kWh higher than the contract rate, if Claiborne, WST, and Valley decide not to extend their ARCs, LaGen could make more money than it would if these three members had elected to extend their ARCs.[80]

As stated before, a plan proponent is not required to guarantee success to satisfy section 1129(a)(11), but only give a reasonable assurance of commercial viability. Based upon the evidence presented, the court finds that with regard to financial feasibility, the Trustee's Plan offers a reasonable probability of success and therefore satisfies section 1129(a)(11).

#### (b) *THE SWEPCO PLAN*

Numerous parties have objected to the SWEPCO Plan on the basis of its lack of feasibility.

▮ (1) *Treatment of Non–Consenting Members' ARCs.* The Trustee argues that SWEPCO's failure to address the non-consenting Members' ARCs will result in the need for Cajun's further financial reorganization. The Trustee asserts that the failure of SWEPCO to either assume or assign the contracts will require the Trustee to perform the contracts. As pointed out earlier herein, an executory contract not rejected "rides through" the proceeding unaffected. However, as all of Cajun's physical assets will be transferred to SWECO, the Trustee (and Reorganized Cajun) will be without any resources and thus will be unable to perform the contracts. The obvious result will be a breach of the ARCs. The non-consenting cooperatives would surely have a claim for damages, which Reorganized Cajun would be unable to pay, thus leading to the need for further reorganization.

The SWEPCO Plan's failure to either assume or reject the ARCs of the non-consenting Members results in the conclusion that the SWEPCO Plan does not satisfy the feasibility test of section 1129(a)(11).

▮ (2) *Use of the Union Pacific.* Numerous parties argue that the SWEPCO Plan is not feasible because SWEPCO intends to utilize the Union Pacific ("UP") for delivery of coal from the Powder River Basin to the Cajun facility. The objecting parties contend that the UP will not have the physical resources in place sufficient to move the 5 to 6 million tons of coal necessary to operate the Big Cajun II plant. After hearing the testimony, the court concludes that the SWEPCO Plan is not made unfeasible by virtue of SWEPCO's proposed use of the UP. Sufficient evidence was presented to support the conclusion that there is a reasonable probability that the UP will be able to physically perform that which SWEPCO proposes.

The UP (through its predecessors) has been in the railroad transportation business

---

79. *See* 6/5/98 Tr. at p. 313, ln. 8 through p. 316, ln. 19 (Dr. Yokell).

80. *See* Dr. Yokell's work papers, Section B, Rate Path, Enron Exhibit 1 (4/8/98).

since 1849 [81] and is the largest railroad in the United States in terms of route miles, car loadings, revenue and number of employees.[82] UP's assets are about $27 billion.[83] UP has over 6,500 locomotives which although suitable for hauling coal, are not the preferred method that UP currently utilizes or intends to utilize as part of the all-rail movement.[84] The UP has engineered a new type of locomotive technology called AC Traction.[85] UP has over 965 of these AC Traction locomotives.[86] In addition, in 1998, the Union Pacific ordered an additional 285 AC Traction locomotives.[87]

UP serves and has access to 10 coal mines in the Powder River Basin which is located in eastern Wyoming.[88] The Powder River Basin is the premier coal loading location on the UP lines.[89] UP first began serving the Powder River Basin in 1984 [90] and in 1995, UP moved over 100 million tons of coal; in 1996 UP moved 110 million tons; and in 1997 113 million tons.[91] UP moves coal from the Powder River Basin everyday of the week, every week of the year.[92] UP had plans to move 118 million tons of coal in calendar year 1998.[93]

Over 26 UP coal trains leave the Power River Basin everyday.[94] Currently, UP ships approximately 15 million tons annually to the greater St. Louis area.[95] UP presently has significant all-rail movements from the Powder River Basin to Georgia, Louisiana, and Texas that aggregate over 20 million tons annually.[96]

Mr. Sutton's testimony was clear that UP will be able to move, each year, the 5–6 million tons necessary for the Big Cajun II coal fired units.[97] UP's ability to move the necessary coal from the Powder River Basin to the New Road plant was bolstered by the opinion testimony of Don Hogenson, who is an expert witness with over 40 years in the railroad industry.[98] Mr. Hogenson's testimony was unambiguous that the UP will be able to move the 5 to 6 million tons of coal annually to run the Cajun facilities.[99]

UP will be able to feasibly and reliably move the necessary tonnage on an all-rail movement. Additionally, there is no condition to SWEPCO's closing of this acquisition based on the performance or reliability of the UP or any other part of the proposed fuel chain. SWEPCO will have already paid its $940.5 million in purchase price, and all other plan payments, approximately 18 months prior to the all-rail movement coming into place. In other words, no plan payments are impacted if SWECO falls short of expected coal deliveries. And in the event the UP does encounter difficulty in performing the all-rail movement, SWEPCO presented sufficient testimony to convince the court that it would continue with the rail-barge movement as it presently exists, albeit with entities other than BN and ACMS.

81. 4/29/98 Tr. at p. 15, lns. 5–11 (W.Sutton).

82. 4/29/98 Tr. at p. 17, lns. 2–13 (W.Sutton).

83. 4/29/98 Tr. at p. 17, lns. 16–21 (W.Sutton).

84. 4/29/98 Tr. at p. 18, ln. 19 through p. 19, ln. 2 (W.Sutton).

85. 4/29/98 Tr. at p. 19, lns. 2–5 (W.Sutton).

86. *Id.*

87. 4/29/98 Tr. at p. 19, lns. 6–9 (W.Sutton).

88. 4/29/98 Tr. at p. 22, lns. 17–20 (W.Sutton).

89. 4/29/98 Tr. at p. 22, lns. 21–24 (W.Sutton).

90. 4/29/98 Tr. at p. 22, ln. 25 through p. 23, ln. 4 (W.Sutton).

91. 4/29/98 Tr. at p. 23, lns. 15–21 (W.Sutton).

92. 4/29/98 Tr. at p. 23, ln. 22 through p. 24, ln. 5 (W.Sutton).

93. 4/29/98 Tr. at p. 24, lns. 6–10 (W.Sutton).

94. 4/29/98 Tr. at p. 24, lns. 11–14 (W.Sutton).

95. 4/29/98 Tr. at p. 36, lns. 1–12 (W.Sutton).

96. 4/29/98 Tr. at p. 36, ln. 13 through p. 37, ln. 13 (W.Sutton).

97. 4/29/98 Tr. at p. 41, ln. 24 through p. 42, ln. 10 (W.Sutton).

98. 4/29/98 Tr. at p. 119, ln. 4 through p. 127, ln. 18 (D.Hogenson).

99. 4/29/98 Tr. at p. 170, ln. 24 through p. 177, ln. 10 (D.Hogenson).

For the foregoing reasons, the court concludes that objections to the feasibility of the SWEPCO Plan based upon SWEPCO's proposed use of the UP are without merit.

(3) *SWECO Asset Purchase Agreement.* The Trustee's next argument on lack of feasibility of the SWEPCO Plan relates to the potential that the SWECO Asset Purchase Agreement (the "SWECO APA") may never be consummated. The Trustee contends there is a "material risk" that, if the SWEPCO Plan were confirmed, SWEPCO would refuse to execute the SWECO APA or would attempt to negotiate an asset purchase agreement that is much more favorable to SWECO. Additionally, the Trustee complains that the SWECO APA does not require SWECO to complete its due diligence until after confirmation of the SWEPCO Plan. Also, some of the conditions to the SWECO APA are entirely within SWECO's control, such as entering into new transmission, interconnection, and interchange arrangements satisfactory to SWECO, entering into new power purchase agreements with the consenting Members acceptable to SWECO, and determining whether the financial condition of the Members with whom SWECO would enter into contracts is satisfactory.

The court, upon examination of the SWECO APA, finds that SWECO does not have a due diligence "out." As one might expect in such a tremendously complex transaction where hundreds of millions of dollars are involved, acquisition agreements do and of necessity must include provisions relating to unforseen events. The SWECO APA contains a list of such conditions to the obligations of the parties to consummate the transaction, as does the similar document executed between the Trustee and LaGen. Is there a possibility that the SWECO APA might not be consummated in the event the court were to determine that the SWEPCO Plan were otherwise confirmable? Although the answer is "yes," the possibility of failure to consummate does not rise to the level necessary to determine the SWEPCO Plan is not feasible. On balance, the court finds that the objection to feasibility based upon the SWECO APA is without merit—the docu-

ment does result in a conclusion that there is a lack of "reasonable assurance of commercial viability."

(4) *Litigation.* The UCC argues that the SWEPCO Plan is not feasible because it will lead to substantial litigation with the Fuel Chain, GSU, and others. While the SWEPCO Plan may indeed lead to future litigation, this is not an issue of feasibility under section 1129(a)(11). Section 1129(a)(11) relates only to whether confirmation will likely be followed by liquidation or the need for further financial reorganization of the reorganized debtor. There has been no evidence introduced to indicate that the possibility of future litigation will cause the need for Cajun's further financial reorganization. Accordingly, the court finds that this objection is without merit.

## 11. *Section 1129(a)(12).*

Section 1129(a)(12) requires the payment of certain costs and fees to the clerk and to the United States Trustee. No objection has been filed to either the Trustee's Plan or the SWEPCO Plan regarding this section. Confirmation of any plan will be without prejudice to the United States Trustee's rights regarding payment of required fees. Section 1129(a)(12) is satisfied by both plans.

## 12. *Section 1129(a)(13).*

Section 1129(a)(13) requires certain treatment of retiree benefits following the effective date of the plan. No objection has been filed to either the Trustee's Plan or the SWEPCO Plan with regard to this section. The court find that to the extent applicable, this section has been satisfied by each plan proponent.

## C. *SETTLEMENTS.*

Section 1123 deals with plan contents. Section 1123(a) delineates those *mandatory* provisions which must be included in a plan, while section 1123(b) outlines *permissive* provisions which may be included. Section 1123(b)(3)(A) provides that a plan may "provide for—(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; ..."

Over the course of these proceedings, several disputes among and between various interests were litigated, including the amount of the rejection damage claims of the members of Fuel Chain, if any, and the validity, priority and extent of certain RUS liens. At various times prior to the commencement of the confirmation hearings, motions seeking authority to settle certain claims were filed with the court, and hearings were had on the proposed settlements.

After given due consideration to the impact hearings on such motions were having on the progress of this case, the court entered an order requiring all compromises to be included in the final plans. This was accomplished, and each plan proponent filed its final plan which did include the proposed settlements.

■■■■ The court notes that the settlements proposed in both the Trustee's Plan and the SWEPCO Plan each contain a condition precedent to such settlement being effective, the condition being that the plan proposing such settlement be confirmed. Since neither plan is being confirmed, the court initially felt that consideration of each proposed settlement was inappropriate, due in part to the fact that appeals of denial of plan confirmation are interlocutory and are generally not appealable [100]. However, since the denial of confirmation may be appealed to the district court (with leave of that court), and as the court anticipates that these settlements will be pursued in any future plans, judicial economy requires a consideration of the proposed settlements.

■■■■ In considering whether to approve a settlement in bankruptcy, the court is required to make an "informed and independent judgment" as to whether the settlement is fair, equitable and in the best interest of the estate and creditors.[101] In making this determination, the court is to consider: "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and (3) all other factors bearing on the wisdom of the compromise." [102] The Fifth Circuit, in discussing "the wisdom of the compromise," has suggested consideration of at least two additional factors: (1) the "paramount interest of creditors with proper deference to their views" [103] and (2) the "extent to which the settlement is truly the product of arms-length bargaining, not fraud or collusion." [104]

### (a) THE TRUSTEE'S PLAN

The Trustee's Plan proposes three settlements: (1) RUS Settlement; (2) BN/ACMS Settlement; and (3) WFA/Triton Settlement.

(1) *RUS Settlement.* The Trustee's original settlement agreement with RUS was proposed in November 1996. That agreement was later amended during negotiation of the Trustee's settlements with WFA and Triton to provide for transfer of up to $10.49 million from the proceeds of the sale of collateral subject to the RUS security interest to a fund for the benefit of unsecured creditors other than the RUS. This new amount was in addition to the $9.75 million made available

---

**100.** *In re MCorp Financial, Inc.,* 139 B.R. 820 (S.D.Tex.1992). District courts have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of court, other interlocutory orders and decrees. 28 U.S.C. § 158(a). The court of appeals, however, have jurisdiction to hear appeals only from final orders. 28 U.S.C. § 158(d). For a discussion of "final" orders, see, *Matter of Cajun Electric Power Cooperative, Inc.,* 119 F.3d 349 (5th Cir.1997), and *Matter of Aegis Specialty Marketing, Inc. of Alabama,* 68 F.3d 919 (5th Cir.1995).

**101.** The standard under 11 U.S.C. § 1123(b)(3) is the same as the standard for approval of settlements under Rule 9019, Fed.R.Bankr.P. *See, Protective Committee for Independent Stockholders of*

*TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), *reh'g denied,* 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425 (1968); *Connecticut Gen. Life Ins. Co. v. United Companies Financial Corp. (Matter of Foster Mortgage Corp.),* 68 F.3d 914, 917 (5th Cir. 1995); *United States v. AWECO, Inc. (In re AWECO, Inc.),* 725 F.2d 293, 297 (5th Cir.1984).

**102.** *Connecticut Gen. Life Ins. Co. v. United Companies Fin. Corp. (In re Foster Mortgage Corp.),* 68 F.3d 914, 917 (5th Cir.1995).

**103.** 68 F.3d at 914.

**104.** *Id.*

to unsecured creditors and the payment of administrative, priority, and priority tax claims from cash collateral subject to RUS's lien agreed to in the Trustee's Plan.

The Trustee sought approval for the settlement with RUS independently from the Trustee's Plan, and the court approved the settlement without opposition. Because the Trustee's settlement with RUS applied only to the Trustee's Plan and was contingent upon confirmation thereof, the court subsequently revoked the order approving the settlement and required the settlement to be incorporated into the Trustee's Plan, which was done.

There are no pending objections to the RUS Settlement. The court has reviewed the RUS Settlement in accordance with the above-described Fifth Circuit jurisprudence and finds that the settlement is fair, equitable and in the best interests of the estate and the creditors.

(2) *BN/ACMS Settlement.* In January 1997, the Trustee and LaGen entered into a proposed settlement with BN and ACMS. Pursuant thereto, BN and ACMS agreed to waive any and all distributions on account of damages resulting from the rejection of their executory contracts under the Trustee's Plan in consideration for the settlement of all pending and potential avoidance actions against them [105]. In addition, the Trustee agreed to continue performing under the existing BN and ACMS contracts until the effective date of the Trustee's Plan. Objections to the BN/ACMS Settlement were filed by SWEPCO, the LPSC, the CCM, and Claiborne.

ACMS and BN have filed proofs of claim asserting rejection damage claims totaling $963 million. SWEPCO's expert, Judah Rose, estimated their combined rejection damage claim at $114 million while Joseph Price, Cajun's director of fuel resources and power marketing, placed his estimate of the claims at $541 million. On the other hand, the maximum potential recovery from BN and ACMS under the Trustee's preference actions are approximately $4.5 million. Assuming that Mr. Rose's estimate is correct,

the estate would appear to benefit by the sum of approximately $109.5 million by offsetting these figures.

The objecting parties contend, however, that the estate is losing money by allowing the Trustee to continue to pay the above-market rates under the BN and ACMS contracts. Further, the objectors assert that the fact that the settlement is only effective if the Trustee's Plan is confirmed results in BN and ACMS receiving substantial benefits without giving up anything in exchange. In effect, if the Trustee's Plan is not confirmed, BN and ACMS will have continued to receive payments under their contracts, which the objecting parties argue are above-market, and will still be able to assert their full rejection claims. The objecting parties argue that allowing the Trustee to continue to pay the contract prices unfairly penalizes the ratepayers of Louisiana, as the increased fuel costs are passed through the Members to the ultimate consumer.

Finally, the objecting parties argue that the settlement was not negotiated at arms' length and in good faith. The objectors assert that there was collusion on the part of BN and ACMS on the one hand and LaGen on the other, and that the settlement provides benefit to LaGen rather than to the estate.

(a) *The Probability of Success in the Litigation, with Due Consideration for the Uncertainty in Fact and Law.*

■ The testimony and argument of counsel clearly indicate that there is substantial uncertainty in fact and law with regard to this issue. Even assuming that the estimates of SWEPCO's expert, Mr. Rose, are the appropriate figures to consider, it would appear that if this matter were to go to trial, the rejection claims of BN and ACMS would approximate $114 million. The Trustee's maximum recovery on the preference claims against BN and ACMS, however, would only be approximately $4.5 million. In addition, the possibility exists that the rejection damages will be in excess of Mr. Rose's estimates. Based upon these facts, the court

---

**105.** Complaints pursuant to section 547 have been brought against both BN and ACMS, seek-

ing to avoid transfers of $2,107,306.48 and $2,364,393.54, respectively.

concludes that this factor clearly weighs in favor of approving the BN/ACMS Settlement.

(b) *The Complexity and Likely Duration of the Litigation, With Due Consideration for the Uncertainty in Fact and Law.*

There is no question but that any litigation of rejection damages would be highly contested and would result is substantial time and litigation costs for all parties concerned. The parties have already spent considerable time, effort, and resources in litigating whether the settlement should be approved. The additional burden on the parties in litigating the rejection damage claims would certainly cause plan confirmation to be further and unduly delayed. The court finds that this factor clearly weighs in favor of approving the settlement.

(c) *Arm's Length Bargaining.*

The objecting parties argue that the settlement was not proposed in good faith and as a result of arm's length bargaining. They instead argue that the settlement is a result of collusion between LaGen and BN and ACMS, and that the settlement provides benefit to LaGen rather than to the estate.

While the court heard considerable testimony during the hearings on the settlements, the court does not recall any credible testimony to support these allegations of collusion. The Trustee acknowledged that the settlement was negotiated primarily by LaGen on behalf of the estate. This fact, however, in an of itself, does not result in evidence of collusion. On the other hand, the testimony of the Trustee in support of the settlement convinces the court that the fear of a lack of arms length bargaining discussed in *Foster Mortgage* was not present in this case. This element also supports approval of the settlement.

(d) *Reasonable Views of Creditors.*

The overwhelming majority of creditors support the BN/ACMS Settlement, including the UCC and the RUS. Given the status of recovery by unsecured creditors under the Trustee's Plan, any additional recovery would inure only to the benefit of the RUS. Accordingly, the court finds that this factors weighs in favor of approving the settlement.

Having considered the terms of the BN/ACMS Settlement in light of the jurisprudence in this circuit, the court finds that such settlement is in the best interests of the estate and should be **APPROVED.**

(3) *WFA/Triton Settlement.* In September 1997, the Trustee entered into a settlement agreement with Triton and WFA, pursuant to which they agreed to limit their allowed unsecured claim for rejection damages to $4 million and $3.6 million, respectively. In return, the Trustee agreed to dismiss the pending avoidance actions against Triton and WFA amounting to approximately $2.5 million [106]. The proposed settlement is now incorporated into the Trustee's Plan.

Objections to the WFA/Triton Settlement were filed by SWEPCO, the LPSC, the CCM, and Claiborne. The objecting parties argue that the Trustee's analysis is faulty in two respects, namely, the amount of the rejection damage claim of WFA and/or Triton, and the efficacy of the asserted defenses to the preference claims.

● *Rejection Damages.* Joseph Price, Cajun's director of fuel resources and power marketing, testified that, based upon certain assumptions, the potential rejection damage claims of Triton and WFA could be approximately $141 million and $7.2 million, respectively.

Seth Schwartz, Triton's damage expert, testified regarding Triton's rejection damages under two alternative theories—the present value of lost revenues under the contract and the difference between the contract price and market price. In Mr. Schwartz's opinion, the present value of the revenues lost by Triton if its contract were no longer performed would be approximately $516 million. Mr. Schwartz also testified that the difference between the contract price and the market price over the term of

---

**106.** A complaint pursuant to section 547 has been brought against both WFA and Triton seeking to avoid a transfer of $2,564,616.89.

the contract had a present value of $28.4 million.

Frederick Palmer, WFA's general manager and chief executive officer, testified that WFA would incur damages between $15 million and $18 million if Cajun ceased performing under its contract.

Judah Rose, SWEPCO's expert, testified that, based upon Wyoming law, Triton would have no rejection damages. He further opined that WFA's damages would be only approximately $1.1 million before discounting and before mitigation.

The objecting parties set forth numerous arguments as to why the Trustee's analysis is faulty. They initially argue that the Trustee relied on inadequate analysis and expertise in evaluating the rejection damages by having non-expert lay personnel perform the myriad calculations that underlie the settlement decision.

Joseph Price, an employee of Cajun, was assigned the responsibility of calculating the possible rejection damages which would be owed to Triton and WFA under their contracts if the contracts were rejected by the Trustee. The objecting parties argue that Mr. Price, who is neither an attorney, accountant, economist, nor expert on any type of contract damage issue, was not qualified to advise the Trustee regarding rejection damages. The Trustee argues that Mr. Price, as the individual who is in charge of Cajun's coal purchases and who administers the coal contracts on a daily basis, was the most competent person to examine the potential rejection damages of Triton and WFA.

The court permitted Mr. Price to testify regarding his calculations of potential Triton/WFA damages. While he did not qualify as an "expert" under Rule 702, Fed.R.Evid., his testimony was certainly admissible under Rule 701[107]. Objections to Mr. Price's testimony are properly directed at the weight to be accorded such testimony rather than its admissibility.

The objecting parties next argue that the discount rates applied by Mr. Price were excessively low. Mr. Price applied discount rates of 7.13 – 12.00% to the Triton contract, and 8.50% – 12% to the WFA contract.

The objecting parties also argue that the Trustee failed to apply the appropriate state law damages standard under the Wyoming UCC to the rejection damages calculations or present any analysis of a contract minus market calculation as would be appropriate under Wyoming law. Under the Wyoming Uniform Commercial Code, three distinct measures of damages are possible: the difference between the contract price and market price[108], the full amount of lost revenues in an action for the price[109], and lost profits.[110] The lowest of these three calculations would be the difference between the contract price and market price. Mr. Schwartz testified that under this calculation, Triton would recover approximately $28.4 million. The objecting parties argue that Mr. Schwartz's conclusions are faulty in that he used the incorrect transportation costs and assumed that Triton would replace the contract with sales on the spot market. They contend that this assumption is incorrect because the Triton–Cajun contract will not be replaced by spot market sales, but rather with a contract with LaGen.

Mr. Rose testified that Triton would recover nothing. His conclusion is based upon the triennial price re-opener provisions in Article 7.3 of the Triton contract. Based upon this provision, Mr. Rose believes that the Triton contract price would have always been equal to or less than the market price for the Triton coal.

● *Preference Defenses.* The objecting parties argue that the Trustee's claim that the

---

**107.** Fed.R. of Evid. 701 provides:

 If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are
 (a) rationally based on the perception of the witness and
 (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

**108.** Wyo.Stat.1997 § 34.1–2–708(a).

**109.** Wyo.Stat.1997 § 34.1–2–709.

**110.** Wyo.Stat.1997 § 34.1–2–708(b).

necessity of payment doctrine would be a valid defense to the preference claim is incorrect. The Trustee testified that the preferential payment to WFA could have been made post-petition under the necessity of payment doctrine, and therefore the necessity of payment doctrine [111] could be a valid defense to the preference action. The objectors argue that this is incorrect because the necessity of payment doctrine has been limited to employee wage claims and certain other claims which are otherwise entitled to priority under section 507.

(a) *The Probability of Success in the Litigation, with Due Consideration for the Uncertainty in Fact and Law.*

■ The testimony and arguments of counsel clearly indicate that there is substantial uncertainty in fact and law with regard to this issue. The witnesses, expert and otherwise, indicated the various methods which could be utilized in ascertaining the proper amount of rejection damages. The opinions of the various witnesses established possible rejection damages for Triton and WFA between $0 and $516 million, and between $1.1 million and $18 million, respectively. If the Trustee were successful on his preference action against WFA/Triton, it appears as though he could recover a maximum of $2.5 million, less attendant costs. By virtue of the WFA/Triton Settlement, Triton will receive $4 million and WFA will receive $3.6 million, the "swing" resulting in a net cost to the estate of $10.1 million.

Based upon the testimony presented, the court agrees with Mr. Rose's argument that Triton's damages would probably be substantially reduced based upon the triennial price re-opener provisions in Triton's contract. However, the court does not agree that Triton's damages would be $0. Assuming that Mr. Rose is correct, Triton would still suffer some damages before the price re-opener becomes effective. Although it is uncertain as to the amount of those damages, the court is satisfied that Triton would be entitled to some rejection damages following rejection of its contract. As stated before, there is substantial uncertainty as to the level of those damages.

The court likewise believes that WFA could prove substantial rejection damages. While WFA's rejection damages would probably not be as high as the $15–18 million as set forth by Mr. Palmer, the court believes that the damages would be in excess of the $1.1 million figure supplied by Mr. Rose.

Regarding the preference defenses, the court agrees that the necessity of payment defense may not be applicable to the present case. However, there are potentially several other defenses available to WFA and Triton. For example, Mr. Palmer testified that at the time that WFA received the cashier's check which is the subject of the preference claim, Cajun was not delinquent on any of its obligations to WFA [112]. Thus, WFA will likely argue that the payment was not made for or on account of an antecedent debt. In addition, based upon the structure of the arrangement between Cajun, WFA and Triton, there are issues as to who was the actual transferee of the funds. WFA could argue that it was a mere conduit of funds between Cajun and Triton and Triton could argue that it was a transferee that took for value and in good faith. Without question, the preference action against WFA/Triton would not be a slam-dunk. Further, under the Trustee's Plan, any funds collected against WFA/Triton would benefit almost exclusively RUS, BN/ACMS and WFA/Triton, neither of which has opposed the settlement.

While it is possible that the Trustee could prevail in litigation regarding the rejection claims and WFA/Triton would recover little or no damages and that the Trustee would recover $2.5 million from the preference action, there is also the possibility that the estate could be liable for over $500 million in rejection claim damages and that WFA/Triton would owe nothing on the preference action. The court believes that the substantial uncertainty in law and fact regarding the rejection claims, as well as the preference action, weighs in favor or approving the settlement.

---

111. *See, e.g., In re Gulf Air, Inc.,* 112 B.R. 152 (Bkrtcy.W.D.La.1989).

112. 10/23/97 Tr. at pp. 59–60 (F.Palmer).

**(b)** *The Complexity and Likely Duration of the Litigation, With Due Consideration for the Uncertainty in Fact and Law.*

There is no question but that any litigation of rejection damages would be highly contested and would result is substantial time and litigation costs for all parties concerned. The court finds that this factor clearly weighs in favor of approving the settlement.

**(c)** *Arm's Length Bargaining.*

There is no evidence of bad faith on the part of either the Trustee or WFA/Triton in reaching the terms of the proposed settlement. Accordingly, the court finds that the WFA/Triton Settlement was the result of arm's length bargaining between the parties.

**(d)** *Reasonable Views of Creditors.*

The overwhelming majority of creditors support the WFA/Triton Settlement, including the UCC and the RUS. Given the status of recovery by unsecured creditors under the Trustee's Plan, any additional recovery would inure only to the benefit of the RUS. Accordingly, the court finds that this factor weighs in favor of approving the settlement.

Taking all relevant factors into consideration, the court concludes the BN/ACMS Settlement is in the best interests of the estate and should be **APPROVED.**

**(b)** *THE SWEPCO PLAN*

As discussed at length earlier in these reasons, the SWEPCO Plan incorporates a settlement with RUS. While the SWEPCO/RUS Settlement appears in many respects to be virtually identical to the Trustee's settlement with RUS, numerous parties, including the Trustee, have objected to the SWEPCO/RUS Settlement.

The SWEPCO/RUS Settlement provides, in relevant part that:

4. Allowed Secured Claim. The RUS shall be deemed under the Joint Plan, without taking further steps, to have as against Cajun and its estate, a fully perfected security interest all Cajun's assets and the proceeds thereof as to which it is a party to a security agreement, mortgage or pledge (subject only to any prior interest held by a third-party not involving a claim of Cajun or its estate).

* * *

7. Transfer of Funds for the Benefit of Unsecured Creditors. The RUS consents to the transfer on the Effective Date of the Joint Plan, from the proceeds of the sale of assets securing RUS's claims, $20.24 million to unsecured creditors in Classes 6(a) and (b) under the Joint Plan. The RUS agrees that, as to the Settlement Amount, RUS shall not be entitled to receive any distribution on account of any of its claims whether secured, unsecured, or administrative in nature. If, after payment in full of allowed unsecured claims under the Joint Plan (other than the deficiency claim of the RUS), funds remain from the liquidation of assets and from successful avoidance actions, the RUS, as the sole remaining holder of a general unsecured claim, will receive such remaining funds.

The difference in views between the Trustee/RUS Settlement and the SWEPCO/RUS Settlement is not the terms of the settlements, but rather the results or effects of the settlements under the two plans and the impact under each plan of the respective settlement upon unsecured creditors, particularly the Fuel Chain. Under the Trustee's Plan, the Fuel Chain has worked out settlements and is not concerned with the possibility of rejection damage claims. However, under the SWEPCO Plan, the Fuel Chain contracts are to be rejected. Accordingly, the Fuel Chain asserts large rejection claims, which the objectors argue will go virtually unpaid if the SWEPCO/RUS Settlement is approved.

As stated above, in considering whether to approve a settlement in bankruptcy, the Court must consider four factors: (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; (3) the extent to which the settlement was the result of arms-length bargaining; and (4) consideration of the reasonable views of creditors.

(1) *The Probability of Success in the Litigation, with Due Consideration for the Uncertainty in Fact and Law.*

██ In determining whether to enter into the settlement with RUS, SWEPCO relied

upon the review conducted by the Trustee. While numerous parties have argued that SWEPCO should have conducted its own independent review, the court finds that it was reasonable for SWEPCO to rely upon the Trustee's opinions in that regard. The Trustee testified he believes that a settlement amount of $20.24 million regarding the merits of the lien-avoidance claims against RUS is reasonable when considering the probability of success on the merits of those claims, and the costs, risks and duration of litigation with RUS.[113] The Trustee's decision to settle the RUS lien disputes included consideration of whether the security interest the RUS asserted in the ARCs would be governed by Article 9 of the Uniform Commercial Code as enacted in Louisiana.[114] The court believes that the uncertainty in fact and law with regard to the issue of avoiding RUS's liens weighs heavily in favor of approving the SWEPCO/RUS Settlement. While the estate may very well be able to assert certain arguments, there is a risk that RUS could prevail. If RUS were to prevail in that respect, the damage to the estate would be substantial.

**(2)** *The Complexity and Likely Duration of the Litigation, With Due Consideration for the Uncertainty in Fact and Law.*

The court finds that this factor clearly weighs in favor of approving the settlement. Litigation of factual and legal issues with RUS likely would be time consuming and extended. Because of the significant amounts at stake, litigation costs likely would be significant and the delay substantial.

**(3)** *Arm's Length Bargaining.*

Many of the objecting parties argue that the SWEPCO/RUS Settlement is not a product of arms-length bargaining. The basis for this assertion is that SWEPCO was not concerned with reviewing the merits of the settlement, but was only concerned with getting a positive vote from RUS. While SWEPCO was eager to reach settlement with RUS, SWEPCO did rely upon the investigation and

review conducted by the Trustee. The court has previously stated that such reliance was reasonable. Additionally, when stating that a settlement must be the product of arm's length bargaining, the Fifth Circuit was concerned with fraud and collusion. 68 F.3d at 918. There has been no evidence introduced that SWEPCO and RUS were acting in collusion. In fact, SWEPCO and RUS have been at odds during the entire course of this proceeding and RUS continues to vehemently support the Trustee's Plan over the SWEPCO Plan. The court cannot imagine any circumstance in this case wherein RUS would be acting in collusion with SWEPCO. Accordingly, the court finds that the SWEPCO/RUS Settlement is the product of arms-length bargaining, and not of fraud or collusion.

**(4)** *Reasonable Views of Creditors.*

■ Finally, the court must consider the paramount interest of creditors with proper deference to their *reasonable* views:

> a bankruptcy court may not ignore creditors' overwhelming opposition to a settlement. We believe a bankruptcy court should consider the amount of creditor support for a compromise settlement as a "factor bearing on the wisdom of the compromise," as a way to show deference to the reasonable views of the creditors.

68 F.3d at 918.

Each member of the Fuel Chain, *i.e.*, Triton, WFA, BN and ACMS, have objected to the SWEPCO/RUS Settlement, as have S/PC/C and the UCC. The reason the Fuel Chain creditors object to the SWEPCO/RUS Settlement and not to the Trustee/RUS Settlement results from the impact of the respective settlements.

Under the SWEPCO Plan, the members of the Fuel Chain will hold rejection claims ranging in amounts from $115 million to over $1.5 billion. When this amount is compared to the settlement amount of $20.24 million, the objectors contend that they, as well as other unsecured creditors, will receive only a

---

**113.** 4/14/98 Tr. at p. 256, ln. 24 through p. 257, ln. 6 (R. Mabey); Tr., deposition of R. Mabey, 4/3/98 at p. 56, ln 10 through p. 57, ln. 11. APPENDIX A.

**114.** 4/14/98 Tr. p. 276, lns. 6–18 (R. Mabey).

small fraction of their claims. When the potential dividend to be paid to rejection and preference claimants is compared to the size of the possible dividend if the objections to RUS' liens are litigated successfully, the settlement loses merit in the objectors' eyes. Although there is a risk that RUS would prevail against attempts to avoid its liens, the Fuel Chain would rather take that risk than settle for receiving a minuscule fraction of their claims. If the estate could avoid RUS's lien on the ARCs, as the Fuel Chain asserts, they conclude that the value of such avoidance actions would be far in excess of the recovery from RUS in the SWEPCO/RUS Settlement because of the significant value of the ARCs. Are these views reasonable?

The court acknowledges that a result of the SWEPCO/RUS Settlement will result in the distribution to unsecured creditors being significantly watered down. What the members of the Fuel Chain and the UCC do not address, however, is the effect on all unsecured creditors in the event there is no settlement with the RUS. To illustrate this effect, the court assumes the following facts: the RUS claim is $4 billion, of which $500 million is secured by Cajun's non-nuclear assets, excluding the ARCs. Pursuant to section 506(a), therefore, RUS has a secured claim of $500 million and an unsecured claim of $3.5 billion. If we assume rejection damages of $200 million and other unsecured claims of $7 million, the RUS unsecured claim will be in excess of 94% of all unsecured claims. Think how minuscule the distributions to other unsecured creditors would be under that scenario.

Although there is considerable opposition to the SWEPCO/RUS Settlement, the opponents are primarily entities who have reached settlement with LaGen for future services; and as a result of that agreement, the members of the Fuel Chain have waived any claim for rejection damages under the Trustee's Plan. One cannot say that the Fuel Chain's opposition to the SWEPCO/RUS Settlement, therefore, is based upon objective considerations of distribution under the SWEPCO Plan.

Accordingly, the court does not find that the views of the opponents to the SWEP-CO/RUS Settlement are reasonable under the circumstances, and, for that reason, the court holds that the SWEPCO/RUS Settlement should be **APPROVED**.

### D. *MISCELLANEOUS.*

Following the filing of the plan amendments in March, the Trustee filed his MO-TION AND COMBINED MEMORANDUM FOR ORDER PURSUANT TO RULE 3019 RESPECTING POST–SOLICITATION MODIFICATIONS TO TRUSTEE'S THIRD AMENDED PLAN OF REORGA-NIZATION DATED NOVEMBER 8, 1996, AS MODIFIED AS OF MARCH 18, 1998 ("Trustee's 3019 Motion") and SWEP-CO/CCM filed its JOINT MOTION OF SWEPCO AND THE COMMITTEE OF CERTAIN MEMBERS PURSUANT TO BANKRUPTCY RULE 3019 FOR AP-PROVAL OF POST–SOLICITATION MOD-IFICATIONS INCLUDED IN THE AMENDED AND RESTATED JOINT PLAN OF REORGANIZATION DATED MARCH 18, 1998 ("SWEPCO 3019 Motion"). Conditional objections to the Trustee's 3019 Motion were filed by SWEPCO and the CCM. Objections to the SWEPCO 3019 Motion were filed by the Trustee, BN, ACMS, WFA, Triton, UCC, S/PC/C, and Debt Acquisition Company of America IV, L.P.

As the court has denied confirmation of each of the plans, both the Trustee's 3019 Motion and the SWEPCO 3019 Motion are **DENIED AS MOOT**.

### CONCLUSION

For the foregoing reasons, as well as the reasons assigned in Adv. 96–1052, 230 B.R. 693, the court declines to confirm either the Trustee's Plan or the SWEPCO Plan, as each plan fails to satisfy the necessary confirmation standards of section 1129(a). Further, since neither plan satisfies all subparagraphs of section 1129(a) other than section 1129(a)(8), cramdown under section 1129(b) is not available.

The parties are aware that because of his familiarity with the significant litigation in which Cajun was involved with GSU and RUS, the District Court withdrew the reference of this case on the day it was filed.

Thereafter, the District Court referred matters to this court which were deemed to involve discrete bankruptcy issues, such as disclosure statement and confirmation matters. In view of the court's decision not to confirm either plan, the court intends to suggest to the District Court that a status conference be held within a reasonable time in order to establish procedures for further progress in this case.